HOAN, Appellant, vs. JOURNAL COMPANY and others, Respondents.

*April 15—July 7, 1941.*

For the appellant there were briefs by *Francis E. McGovern* and *John J. Devos,* attorneys, and *Corrigan & Backus* of counsel, all of Milwaukee, and oral argument by *Mr. McGovern, Mr. Devos,* and *Mr. Walter D. Corrigan, Sr.*

For the respondents there were briefs by *Miller, Mack & Fairchild,* and oral argument by *J. G. Hardgrove* and *Robert P. Harland,* all of Milwaukee.

The following opinion was filed May 20, 1941:

ROSENBERRY, C. J.   In his complaint the plaintiff sets forth two causes of action.   We shall not attempt to set forth in this opinion the pleadings or the facts in their entirety but only so much thereof as is necessary to an understanding of the questions presented for decision.

The plaintiff alleged that the defendant Journal Company is publisher of the Milwaukee Journal; that the defendant Grant is its managing editor and one of its principal stockholders and a director of the company, in immediate charge and control of the paper and knew of the malicious attacks on the plaintiff complained of; that the defendant Eklund is a newspaper

reporter employed by the Journal Company; that plaintiff was elected mayor of the city of Milwaukee in April, 1916, and ever since continuously had been mayor down to the time of the matters complained of.

The plaintiff further alleged that since he was elected, the Journal Company adopted and followed consistently and continually a policy of defaming and vilifying the plaintiff, holding him up to public ridicule and contempt, stating and insinuating that he was insincere, unworthy of holding the office of mayor, insinuating that he was guilty of various acts of official misconduct as such mayor; that he was guilty of dishonest practices, misdemeanors, and other illegal acts, and thereby sought to discredit him in said city and elsewhere; that in furtherance of that policy the defendant Grant caused all the false and defamatory matter and articles referred to in the amended complaint to be published in the Milwaukee Journal, and in doing so the Journal Company and the defendant Grant have employed the defendant Lawrence C. Eklund to assist them in preparing, publishing, and circulating said defamatory matter and articles; that the adoption of this policy has been purely malicious on the part of each of the defendants; that for many years the defendants maliciously attacked and defamed the plaintiff and published many malicious falsehoods of and concerning him; that on Saturday, October 26, 1935, a bomb containing high explosive was placed and caused to be exploded by some person or persons, then unknown, at the city hall of the village of Shorewood, an adjoining suburb, whereby the building was greatly damaged, surrounding property impaired, and many lives were endangered; that the next day, a bomb was placed and caused to be exploded by some person or persons, then unknown, at the bank building of Citizens Branch Office of First Wisconsin National Bank at 3602 West Villard avenue, in Milwaukee, and on the same day a bomb was placed at the East Side Branch of that bank at the corner of East North avenue and North Farwell avenue; that

on October 31, 1935, a bomb was placed and exploded at the fifth-precinct station of the police department of the city of Milwaukee; that on the same day a bomb was placed and exploded at the third-precinct station of said police department at the corner of North Twelfth and West Vine streets in the city of Milwaukee.

It was further alleged that on account of said repeated bombings, the citizens of said city and territory surrounding the city became greatly disturbed and disquieted, and a feeling of apprehension and of impending danger prevailed; that offers of large rewards for the apprehension and prosecution of the perpetrators were made; that all local newspapers carried full and alarming accounts of said acts; citizens were publicly called on to aid the police department and other law-enforcing agencies to discover and apprehend the perpetrators of said bombings; that many people became fearful and apprehensive of imminent danger and peril to themselves, their families, and friends.

It is further alleged that the Journal Company and Grant caused the defendant Eklund to go to Sheboygan Falls and interview the mayor of said city, and on November 3, 1935, the day of the last bombing, which had disclosed who probably were and had been the perpetrators of said bombings, with intent to defame and injure the plaintiff, published a news article of and concerning him, which contained the following false and defamatory matter:

"The mayor of Sheboygan Falls has slight regard for his fellow mayor, Daniel Webster Hoan of Milwaukee, which was shunned by Kinite in its return to the state.

"'Mayor Hoan travels around the country telling how well Milwaukee is governed,' said the mayor of Sheboygan Falls. 'Meanwhile terrorists bomb Milwaukee's police stations and banks. Mayor Hoan himself is to blame for those bombings.'"

It was further alleged that reference to the plaintiff had no relation to the subject matter which was contained in the article, but was injected maliciously and solely for the purpose

of defaming and injuring the plaintiff; that the article so published was in no sense a legitimate criticism of a public official, but deliberately and with malice aforethought, falsely charged the plaintiff with commission of a felony; that in publishing said article on Novembr 3, 1935, the defendants meant and intended in effect to charge and did charge and accuse plaintiff with the crime of malicious and felonious destruction of property by dynamite and other explosives, with having conspired, counseled, abetted, and encouraged those who actually exploded said bombs, and with having sympathized with, incited, encouraged, aided, abetted, harbored, and protected said persons who caused said explosions; with having, "as mayor of said city and principal law-enforcing officer thereof," intentionally failed to protect it, its citizens, their lives and property from said bombings and the property damage resulting therefrom; that since the publication of said libel on November 3, 1935, and wholly apart from it, the defendants have continued their policy of maliciously defaming, vilifying, and holding plaintiff up to public ridicule, scorn, and enmity, and have repeatedly since then maliciously published about him many false, defamatory, and scurrilous articles.

For a second cause of action the allegations of the first cause of action are substantially repeated, the additional allegation being that the matter was republished on November 4, 1935, the day following the accidental explosion, which resulted in the death of three persons.

The defendants answered. In their answer the defendants deal with each paragraph of the complaint, specifically denying allegations where a matter was to be put in issue, other matters standing admitted. By paragraphs 21 and 22 they plead in justification as follows:

. "21. As and for a further answer to said complaint and in justification of the alleged libelous statement quoted in paragraphs 12 and 21 of said complaint, and by way of defense in bar, the defendants allege the matters set forth in this paragraph of this answer.

"(a) At the time of said publication, and for many years prior thereto, the plaintiff had been the mayor of the city of Milwaukee. The language complained of was used in an article dealing with the action of a certain industrial corporation therein named which had been in business outside of the state of Wisconsin and was about to locate its principal plant at the city of Sheboygan Falls, Wisconsin, referred to in said complaint, and containing an interview with one F. A. Leighton, who then was the mayor of the said city of Sheboygan Falls, given prior to November 3, 1935. In said interview said Leighton discussed the measures which he asserted he had taken to insure the peaceable prosecution of the business of said industrial corporation, and desirable industrial relations between it and its prospective employees. In the course of said interview said Leighton did, in truth and in fact, use the language quoted in said paragraphs 12 and 21.

"(b) In the course of said interview, which is set out in full in the article in which the language complained of appears, which article consists in part of direct and in part of indirect quotation from the interview so given by said Leighton, were stated the measures for dealing with the preservation of order which he had adopted and which he sought to justify. Said measures were extraordinary and dictatorial and included the exercise of powers untried and of undetermined legality. Read in connection with the article as a whole, the language complained of does not charge the plaintiff with being to blame for the bombings referred to either in the sense that he had caused the same or conspired, counseled, abetted or encouraged those who actually exploded said bombs, or sympathized with, incited, aided, abetted, harbored or protected them, or intentionally failed to protect the city of Milwaukee, its citizens, their lives or property, from said bombings, or pursued such a course as to incite others to acts of lawlessness, disorder or want of regard for the safety of the property or lives of the citizens of the city. If the language complained of, read in the light of the article as a whole, could be interpreted as containing any charge, it would be merely a charge that the plaintiff had failed to employ the same methods and to resort to the same expedients which had been employed and resorted to by said Leighton, and as so interpreted, the statement would be true.

"22. As and for a further answer to said complaint and in justification of the alleged libelous statement quoted in paragraphs 12 and 21 of said complaint, as interpreted by the plaintiff, and by way of defense in bar, the defendants allege the matters set forth in this paragraph of this answer.

"(a) The defendants repeat and make part hereof each and every allegation contained and set forth in subdivision (a) of paragraph 21 of this answer as fully as if the same were herein set forth.

"(b) In the course of several years prior to the giving of said interview, there had arisen certain labor troubles at various places in the state of Wisconsin, including the city of Milwaukee. The problem of dealing with labor troubles was state-wide, and the handling of such troubles in any industrial city such as the city of Milwaukee then had a direct relationship to the handling of similar problems in all industrial communities within the state.

"(c) The plaintiff, prior to the giving of said interview, had been doubtful and uncertain as to the extent of his powers and duties as mayor of the city of Milwaukee, and as the head of the police department of the city and as its principal law-enforcing officer, and in the exercise and discharge of said powers and duties. Serious riots and disturbances had occurred in the city of Milwaukee in and about the property of certain industries centered in the city but located, in some cases, in part without the city. The plaintiff had, in that connection, pursued an outwardly weak and vacillating course which had operated to encourage rather than to suppress acts of violence.

"(d) As the defendants are informed and believe, throughout his public life the plaintiff, at many different times and in many places in public addresses, counseled the resort to demonstrations of force and violence as a means of bringing about changes in the political and economic system of the country, well knowing and intending that wide publicity should be given to his statements of that character. Upon information and belief, throughout said period the plaintiff has associated himself with other persons who, with his approval, have followed a like course.

"(e) As the defendants are informed and believe, the plaintiff, in his capacity as mayor of said city of Milwaukee and as the head of the police department of said city, in his directions

to the police department, in conferences ·with representatives of striking employees, in communications made to striking employees indirectly, and to persons in no way connected with the employment in the course of which the strikes above mentioned occurred, counseled, advised and directed that strikers and strike sympathizers might properly resort to demonstrations of force to coerce compliance on the part of employers with the demands of strikers, and to coerce nonstriking employees into discontinuing work and joining the ranks of strikers, in the absence of any adjudication as to the legality of such demands and in the absence of any opportunity for any adjudication thereon, and without the resort to the orderly processes of law provided from the determination of the rights of employers on the one hand and employees on the other, or the rights of particular groups of employees as between such groups and employers or as between the groups themselves. The defendants are also informed and believe that in that connection, the plaintiff had from time to time counseled, advised and directed that the police should maintain the position of mere referees in contests between these varying groups, in effect giving to the contests, in so far as the police were concerned, the status of legalized welfare.

"(f) As defendants are informed and believe, the aforesaid vacillating, doubtful, uncertain and inefficient conduct of the plaintiff in the exercise and discharge of his powers and duties as mayor and law-enforcing officer of said city of Milwaukee, said public pronouncements ,on his part, said action, counsel and direction by him, and the public spectacle of the enforcement of the views and policies of particular groups through demonstrations of force, resulted in many instances in direct attacks on and resistance to public officers of said city and naturally tended to and did lead persons of weak or vicious mentality and who felt that they had grievances against or that there existed grievances in organized society to conclude that they were not only justified in foregoing the resort to the recognized machinery of government for the administration of justice, but might properly take the law into their own hands, and determine and enforce what they conceived to be their own rights, or avenge what they conceived to be wrongs done to them by direct attacks on organized society, and particularly on the law-enforcing officers.

"(g)  While the defendants do not claim or assert and while the article in which the language complained of appeared does not charge that the plaintiff directly or intentionally encouraged the acts of the persons involved in the bombings referred to in said complaint, the defendants allege upon information and belief that had the plaintiff as chief law-enforcing officer of the city of Milwaukee followed a course of vigorously and promptly suppressing violence and riots and detecting thefts, transportation and storage of explosives, the bombings referred to in the complaint and which occurred prior to November 3, 1935, would not have occurred, and the theft and storage of the dynamite which accidentally resulted in the said explosion which occurred on November 3, 1935, would not have occurred.   The defendants allege upon information and belief that at least one of the persons engaged in the bombings referred to in the complaint was a person of weak and vicious mentality, who harbored fancied grievances against organized society and conceived that his personal rights had been violated by organized society, and particularly by the police officers of the city of Milwaukee, and had been so influenced in the said bombings which occurred prior to November 3, 1935, and in the theft of the dynamite so accidentally exploded on November 3, 1935.

"(h)  If the language of the complaint be construed either as charging and accusing the plaintiff with having unintentionally caused said bombings and explosions, or having unintentionally encouraged those who exploded said bombs, or having unintentionally incited or encouraged them, or with having failed in the discharge of his duties as mayor of the city of Milwaukee and principal law-enforcing officer thereof, to discourage acts of violence and to enforce the laws for the preservation of peace and public safety, with the result that such bombings and such explosion occurred, or with having unintentionally promoted in the mind of at least one of the persons engaged in such bombings and in such thefts the condition that led to his action, the statement complained of is, as the defendants are informed and believe, true."

It was further set out that the matter complained of in the publications of November 3 and 4, 1935, was a small portion of the article containing an interview dealing with the duties

of law-enforcing officers and the relations between industry and labor as between themselves, and between industry and labor on the one hand and the public on the other, and it is further alleged that the article contained a fair comment upon the activities and acts of the plaintiff in his capacity as mayor of the city of Milwaukee.

The testimony at the trial was voluminous and took a wide range. In the view that we take of the case it is not necessary to set out or discuss many of the questions raised in briefs of counsel or to state the evidence relating thereto. Under the instructions of the court the jury returned the following special verdict:

"Question 1: Would a person of average intelligence and comprehension, upon reading the entire article in question printed in the Milwaukee Journals of November 3d and 4th, 1935, naturally have understood that it was thereby stated and charged that the plaintiff was guilty as a principal of the crime of malicious destruction of property? Answer: Yes.

"Question 2: If you answer question 1 'No,' then answer this question: Would a person of average intelligence and comprehension, upon reading the entire article in question printed in the Milwaukee Journals of November 3d and 4th, 1935, naturally have understood that it was thereby stated and charged that the plaintiff was guilty as accessory before the fact of the crime of malicious destruction of property? Answer: Yes.

"Question 3: If you answer questions 1 and 2 'No,' then answer this question: Would a person of average intelligence and comprehension, upon reading the entire article in question published in the Milwaukee Journals of November 3d and 4th, 1935, naturally have understood the statement concerning the plaintiff to charge him with neglect in the performance of his duty as mayor of the city to preserve the public peace and good order of the city, as to charge him with moral responsibility for the bombings? Answer: Yes.

"Question 4: If you answer question 3 'Yes,' then answer this question: Did such statement tend or calculate to bring the plaintiff into shame, humiliation or disgrace? Answer. Yes.

"Question 5: If you answer question 3 'Yes,' then answer this question: Was such statement in the light of the article as a whole a fair comment on the acts and conduct of the plaintiff in the performance of his duties as mayor of the city of Milwaukee? Answer: No.

"Question 6: In writing the article in question published in the Milwaukee Journals of November 3d and 4th, 1935, was the defendant, Lawrence C. Eklund, actuated by malice? Answer: Yes.

"Question 7: In publishing the article in question on November 3, 1935, was the defendant, the Journal Company, actuated by malice? Answer: Yes.

"Question 8: In publishing the article in question on November 4, 1935, was the defendant, the Journal Company, actuated by malice? Answer: Yes.

"Question 9: In publishing the article in question on November 3, 1935, was the defendant, Harry J. Grant, actuated by malice? Answer: Yes.

"Question 10: In publishing the article in question on November 4, 1935, was the defendant, Harry J. Grant, actuated by malice? Answer: Yes.

"Question 11: If the court should be of the opinion that plaintiff is entitled to recover, at what sum do you assess his compensatory damages? Answer: $10,000.

"Question 12: If you answer any of questions 7, 8, 9, 10, or 11 'Yes,' and decide to assess punitory damages, then answer this question: What sum do you assess as and for punitory damages? Answer: $10,000.

"Dated June 28, 1940."

In considering the motion made by the defendants to set aside the answers to questions 1 and 2, the court said:

"The court must determine as a matter of law whether the language complained of is capable of the meaning ascribed to it in plaintiff's complaint and as set forth in the first and second questions of the special verdict. (*Grell v. Hoard*, 206 Wis. 187, 193.) Was the language in question reasonably capable of conveying, to a person of average intelligence and comprehension, the meaning that plaintiff was guilty, either as principal or accessory, of the crime of malicious destruction of property? In determining whether the language in question was capable of bearing such meaning, its context must be

taken into account as well as all extrinsic circumstances surrounding the publication. These are important factors to be borne in mind in determining whether a person of average intelligence and comprehension upon reading the entire article in question printed in the Milwaukee Journals of November 3d and 4th, 1935, would naturally have understood that it was thereby stated and charged that the plaintiff was guilty as principal or accessory of the crime of malicious destruction of property. (*Grell v. Hoard, supra.*)

"'Words which standing alone may be reasonably understood as defamatory may be so explained or qualified by their context as to make such interpretation unreasonable.' (Restatement of Law, vol. 3, § 563.)

"The words complained of read as follows: 'The mayor of Sheboygan Falls has slight regard for his fellow mayor, Daniel Webster Hoan, of Milwaukee, which was shunned by Kinite in its return to the state.'

"'Mayor Hoan travels around the country telling how well Milwaukee is governed,' said the mayor of Sheboygan Falls. 'Meanwhile terrorists bomb Milwaukee's police stations and banks. Mayor Hoan himself is to blame for those bombings.'

"This language is a very small portion of an article consisting of almost four columns of defendant's newspaper, setting forth in detail an interview with the mayor of Sheboygan Falls in which he describes in self-laudatory terms methods used by him, as mayor of his city, in preserving law and order. By way of comparison and contrast he points to the plaintiff and his methods and in this connection is reported to have used the language complained of. The subject of the interview related wholly to official acts, conduct and policy of the mayor of Sheboygan Falls.

"All of the facts and circumstances tending to throw light upon the propositions involved in the first and second questions point unmistakably to the conclusion that a person of average intelligence and comprehension who read the entire article in which the language in question appeared could not reasonably have understood the language complained of to convey the meaning that plaintiff was guilty of the crime, either as principal or accessory, of malicious destruction of property. The word 'blame' as used in its context must be held to have a wholly different connotation from that ascribed to it in plain-

tiff's complaint. This conclusion seems to me free from reasonable doubt."

During the course of the arguments, on motions after verdict, the court said:

"I have not omitted to consider the effect of these questions, 3 through to the end of the verdict. And my opinion . . . now is that they are insufficient to support a judgment because they relate to matters in the field of privileged criticism and comment . . . and that the answers to questions 3 to 10, are insufficient to support a judgment in favor of the plaintiff."

It is considered that the trial court made a correct disposition of the issues raised in this case. To make its position as well as the position of this court somewhat clearer some facts should be stated in addition to those appearing in the pleadings. It is difficult to disclose the spirit and purpose of the article in which the alleged defamatory language appears except by a consideration of the article in its entirety. However, it is too long to be printed in connection with this opinion. It is headed:

"TOWN LEADER
TELLS OF LABOR
PEACE PLEDGE."

"Sheboygan Falls Had an
Emergency Before Re-
turn of Factory, De-
clares Doctor."

The writer then goes on to describe the industrial situation in Sheboygan Falls, describes the activities of Sheboygan Falls officials, notes that applications for employment in the Kinite corporation plant are to be made at the city hall; that the relief problem is expected to be solved by the operation of this plant; describes the activities of a local law-and-order league, introduces Dr. F. A. Leighton, the mayor; has a column devoted to a statement by Dr. Leighton of what he

and the citizens of Sheboygan Falls have done to bring about industrial peace. The article then proceeds:

"The doctor was reminded that some union leaders regard him as a dictator who in effect is using 'fascist' methods.

" 'What I've done might seem dictatorial but it was for the protection of our citizens,' was the retort. 'We've got to have law and order and we've done nothing illegal in achieving those purposes.'

"The mayor of Sheboygan Falls has slight regard for his fellow mayor, Daniel Webster Hoan of Milwaukee, which was shunned by Kinite in its return to the state.

" 'Mayor Hoan travels around the country telling how well Milwaukee is governed,' said the mayor of Sheboygan Falls. 'Meanwhile terrorists bomb Milwaukee's police stations and banks. Mayor Hoan himself is to blame for those bombings.'

"Dr. Leighton expressed amusement at published Socialist assertions that Kinite had moved to Sheboygan Falls because it could get cheaper power from the municipal power plant here.

"Power Rates No Issue.

" 'The company didn't move here because of cheaper power,' he said. 'In fact, power-rate discussions didn't enter into the picture until after assurance had been given that there would be no labor trouble here.' "

The article then continues with statements in regard to power rates and what the citizens of Sheboygan Falls were doing in welcoming the new industry and what the citizens were willing to do in connection therewith.

The article was printed in eight-point type and occupied forty-four and one-half inches, or a little over two columns of space, the heading and the first fifteen inches being on the first page, and the remainder was found in the first three columns of the third page. The only reference to the plaintiff or his administration of his office was that contained in the quoted paragraph. It was first issued Sunday, November 3, 1935, and in the same edition appeared an article with

respect to the efforts of the police to apprehend the dyna-
miters.

Dr. Leighton was a witness upon the trial. He denied
many of the statements contained in the article attributed to
him. However, the reader must have understood that he was
the author of the statements, including the one containing
the defamatory matter. It is clear to us as it was to the trial
court that the statement that the mayor was to blame, referred
not to any connection with the activities of the dynamiters
but as a criticism upon his law-enforcing activities, and in that
respect was a fair comment. No person reading the entire
article could reasonably come to the conclusion that the writer
intended or attempted to charge that Mayor Hoan was con-
nected as an accessory or principal with commission of the
crimes which were then the subject of public comment.

Counsel attempts to distinguish this case from *Grell v.
Hoard* (1931), 206 Wis. 187, 191, 239 N. W. 428. In that
case the defendant had charged under the facts stated in
the opinion that the plaintiff was "a killer." The court said:

"Charging a public officer with being inefficient and in-
capable in the performance of the duties of his office when
the charge has some fair and reasonable basis in fact is not
libelous. What constitutes efficiency and capability must
always be matters of opinion. There are no absolute stand-
ards by which the conduct of public officials may be judged.
So far as the charge relates to a lack of regard for human life
and personal safety, it is not a charge against Mr. Grell
personally but a condemnation of the type of ditch which
he, as highway engineer, is having constructed in Jefferson
county."

Probably every public officer, especially those charged with
the preservation of peace and order, feel that they deserve
more praise than they receive and that most of the criticism
leveled at them is unwarranted and unjust. For a long time
there had existed a public controversy in Milwaukee with
respect to two matters of public policy. One involved the

finances of the city and the other the matter of preserving order and protecting life and property during strikes. The Milwaukee Journal had differed very markedly with the mayor in regard to his failure to preserve order in certain industrial conflicts. The mayor justified his conduct on the ground that the employers of the strikers were not conforming to the provisions of section 7 of the National Recovery Act and therefore he was not called upon to interfere. His acts in that regard and his stand respecting other matters relating to the police department brought severe criticism upon him. We have carefully considered the evidence and we concur with the trial court in the view that no intelligent person reading the article in question in the light of the circumstances could fairly and reasonably interpret the article as meaning that Mayor Hoan was connected as a principal or as an accessory with the commission of the crime of malicious destruction of property.

Plaintiff contends that he is entitled to judgment on the answers of the jury to questions 3 to 12 because the published statement holds the plaintiff up to hatred, contempt, and ridicule, and is libelous *per se*. In submitting the case to the jury, the court instructed the jury as follows:

"Question 3: If you answer questions 1 and 2 'No,' then answer this question: Would a person of average intelligence and comprehension, upon reading the entire article in question published in the Milwaukee Journals of November 3d and 4th, 1935, naturally have understood the statement concerning the plaintiff to charge him with such neglect in the performance of his duty as mayor of the city to preserve the public peace and good order of the city, as to charge him with moral responsibility for the bombings?

"Question 4: If you answer question 3 'Yes,' then answer this question: Did such statement tend or calculate to bring the plaintiff into shame, humiliation or disgrace?

"The burden of proof as to these questions, 3 and 4, is upon the plaintiff to satisfy you by a preponderance of the evidence

to a reasonable certainty that they should be answered 'Yes.' But if you are not so satisfied, you will answer them 'No.'

"In answering question No. 3 it is your duty, as it was in connection in answering questions 1 and 2, to consider not only the language complained of but to take into consideration the entire article in which it appears. The instructions just given you in connection with questions 1 and 2 with reference to your duty to consider all that appears in the November 3d and 4th, 1935 editions of the defendant's paper upon the subject of bombings and the other articles which were offered in evidence dealing with the bombings commencing with the edition of October 27, 1935, and continuing down to the publication in question, you will consider to apply equally to question No. 3 and you will take those instructions so given into consideration in answering question No. 3."

The jury having found in answer to questions 1 and 2 of the special verdict that the article in question charged that the plaintiff was guilty as a principal and as an accessory of the crime of malicious destruction of property, it could scarcely have answered questions 3 and 4 under the instructions of the court in any other way than it did. The article failing to charge plaintiff with a crime either as principal or accessory as found by the jury, then we have nothing more in substance so far as Mayor Hoan is concerned than a statement that if Mayor Hoan would pursue the same course of conduct pursued by Mayor Leighton instead of traveling around the country telling how Milwaukee is governed, such activities as were being carried on by the terrorists would not occur and because he did not preserve peace and good order he was to blame for the bombings which caused manufacturers seeking a location to shun Milwaukee; that it was not power rates but the failure to preserve order in Milwaukee that caused Kinite to locate in Sheboygan Falls.

It is considered that this falls clearly within the definition of privileged criticism. There was no attempt in this case as in *Walters v. Sentinel Co.* (1918) 168 Wis. 196, 169

N. W. 564, to hold the plaintiff up to public contempt or to bring the plaintiff into shame, humiliation, or disgrace. The comment relates to nothing but the official conduct of the mayor, and under all of the authorities such conduct may be made the subject of criticism without subjecting the critic to liability.

Restatement, 3 Torts, title B, p. 275, § 606, Privileged Criticism:

"(1) Criticism of so much of another's activities as are matters of public concern is privileged if the criticism, although defamatory,

"(a) is upon,

"(i) a true or privileged statement of fact, or

"(ii) upon facts otherwise known or available to the recipient as a member of the public, and

"(b) represents the actual opinion of the critic, and

"(c) is not made solely for the purpose of causing harm to the other."

The court having correctly determined as a matter of law that the matter complained of was not capable of a defamatory meaning, the statement in respect to Mayor Hoan was clearly a privileged criticism. It is not denied that Mayor Hoan was justly proud of his record as a mayor; that from time to time he made public statements in regard to his record; that as a matter of policy he discriminated with respect to the maintenance of peace and order, putting controversies arising out of labor disputes in one category and other types of disturbances in another; that all of the facts were well known to the public, including the defendants, and it further clearly appears that the statement was not made solely for the purpose of causing harm to the plaintiff, and is therefore not malicious. Many other contentions are made and other questions are raised in the brief of appellant but all fail because the published statement is not defamatory and there is no attempt in the published article to go beyond the limits of privileged criticism.

The plaintiff also contends that he has been deprived of the right of jury trial by the determination of the trial court. It is considered that this contention is without merit.

The court determines whether a communication is capable of a defamatory meaning while it is the function of the jury to determine whether a communication capable of a defamatory meaning was so understood by its recipient. (Restatement, Defamation, § 614.) This is the general rule except in jurisdictions where the jury is made the judge of the law and the facts. 17 R. C. L. p. 423, § 182.

It has been the law of this state since 1871. In *Filber v. Dautermann* (1871), 28 Wis. 134, 135, it was alleged in the complaint that the defendant said of the plaintiff: "You have cheated and robbed orphan children out of fourteen hundred dollars." Other allegations in the complaint showed that one John Freling assigned to the plaintiff a mortgage for $750, the consideration of such assignment being that the plaintiff agreed in writing to support and maintain Freling during his natural life, and that Freling died in 1866, leaving several orphan children. The innuendo stated in the complaint is that by the speaking of the words aforesaid, the defendant intended to have it understood that the plaintiff had cheated and stolen the property of John Freling's orphan children. The trial court sustained a demurrer to the complaint on the ground that it did not state facts sufficient to constitute a cause of action. On appeal to this court the order sustaining the demurrer was affirmed. The court said (p. 136):

"The question whether the words spoken impute a charge that the plaintiff had been guilty of a criminal offense, and that such words are therefore actionable, is one of law, to be determined by the court. . . .

"Of course no argument is necessary to show that the speaking of the words in that sense cannot possibly impute a criminal offense. The most that can be claimed in that direction is, that they charge that the plaintiff obtained an assignment of such mortgage by some fraud, the character of which is entirely unexplained."

The court also held that the words were not actionable by themselves.

See *Singler v. Journal Co.* (1935) 218 Wis. 263, 260 N. W. 431. In that case it was not necessary to determine whether the alleged publication was capable of a defamatory meaning but the general rule is stated and the cases sustaining it cited.

In determining as it did that the language complained of was not susceptible of a defamatory meaning, the trial court in no way invaded the province of the jury.

*By the Court.*—Judgment affirmed.

The following memorandum was filed July 7, 1941:

PER CURIAM (*on motion for rehearing*). In support of his motion for rehearing, plaintiff contends that in the trial of the action he was denied due process of law and the equal protection of law under the Fourteenth amendment to the constitution of the United States. We have carefully examined this contention and find no basis for its support in the record.

Motion for rehearing denied with $25 costs.