**James W. MILSAP, Plaintiff,**

v.

**JOURNAL/SENTINEL, INC., Gregory D. Stanford, David Behrendt, and Paul E. Kritzer, Defendants.**

**Civ. A. No. 95–C–86.**

United States District Court, E.D. Wisconsin.

Sept. 11, 1995.

**408**

James W. Milsap, St. Paul, MN, pro se.

John R. Dawson, Foley & Lardner, Milwaukee, WI, for defendants.

## ORDER

TERENCE T. EVANS, Chief Judge.

On May 5, 1993, Gregory D. Stanford, a columnist for what was then the Milwaukee Journal, wrote a complimentary column[1] after the death of a fellow journalist, who was also, apparently, a friend. Judging from the column, I'd say that Carole Malone was quite a woman. However, in revealing to the reader the flavor of Carole Malone's personality, Mr. Stanford used plaintiff James W. Milsap as a foil. Mr. Milsap was not pleased and has sued Mr. Stanford, two other newspaper officials, and the owner of the newspaper itself. The paper is now known as the *Milwaukee Journal Sentinel.*

Mr. Milsap claims he was defamed; in addition, he asserts claims for conspiracy, fraud and deceit, invasion of privacy, and the intentional infliction of emotional distress. Jurisdiction exists under 28 U.S.C. § 1343 as well as diversity of citizenship. Mr. Milsap now lives in Minnesota; the defendants are citizens of Wisconsin.

The defendants have moved to dismiss the action, pursuant to rule 12(b)(6) of the Federal Rules of Civil Procedure. However, because they have presented matters outside the pleadings, the motion is treated as one for summary judgment, pursuant to rule 56, Fed.R.Civ.P.

■ As is true of any motion for summary judgment, this one can only be granted if there is no genuine issue of material fact and if the evidence shows that the defendants are entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, because of the chilling ef-

fect of defamation suits on the exercise of first amendment rights, summary judgment is particularly useful in resolving cases based on such claims. *See McBride v. Merrell Dow and Pharmaceuticals, Inc.,* 717 F.2d 1460 (D.C.Cir.1983). Nevertheless, an accommodation must be reached between vigorous debate on public issues, which the first amendment was designed to protect, and protection to the reputations of individuals. *Hutchinson v. Proxmire,* 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979).

The undisputed, background facts—many taken from the complaint—relevant to an understanding of the controversy are that Mr. Milsap was appointed executive director of the Greater Milwaukee Opportunities Industrialization Center (GMOIC) in July 1967. Persons from GMOIC were critical of him, and he was fired by October 1968.

In 1967, Mr. Milsap opened a meeting hall called Inner City Hall. The hall's function was to educate "indigenous" persons, especially blacks, and keep them well-informed politically and economically.

Inner City Hall set up phone banks into each area of the black community and organized a voter registration campaign. In 1968, Senator Eugene McCarthy, who was that year running for President of the United States, made a campaign appearance at Inner City Hall.

In 1967, Mr. Milsap also began a newspaper—*The Torch.* According to Mr. Milsap, it was viewed by other black newspaper publishers as a competitor for limited advertising dollars. Mr. Milsap states that he began to be viewed as an outsider with uncomfortable political views. It became difficult for him to conduct fund raisers or do his job. Eventually, he was locked out of GMOIC's building, and fired.

*The Milwaukee Journal, Milwaukee Sentinel,* and *Milwaukee Courier* (a weekly newspaper sold primarily in the African-American community) published a number of articles about Mr. Milsap's activities in 1967, 1968, 1969, and 1970.

---

1. The column is attached.

One of the defendants in this case is Gregory D. Stanford, an editorial writer and columnist at the *Milwaukee Journal Sentinel.* Mr. Stanford has worked as a reporter, writer, and columnist at the *Journal Sentinel* and its predecessor, *The Milwaukee Journal,* since September 1971.

Mr. Stanford has been in Milwaukee since 1964, when he moved here to attend Marquette University. He met James W. Milsap in 1968, and in the spring of that year, Mr. Stanford was hired to work as the editor of *The Torch.* Mr. Stanford has also worked as a reporter for other publications in Milwaukee, including the *Soul City Times,* the *Milwaukee Courier,* and the *Catholic Herald Citizen.* He is, of course, the author of the column that appeared under his name in *The Milwaukee Journal* on May 5, 1993.

In preparing the column, Mr. Stanford relied in part on his personal experiences and on articles that had appeared in past editions of *The Milwaukee Journal* and *Milwaukee Sentinel.* He located the articles in the newspapers' archives, and he states that he considered them to be truthful, reliable reports.

Mr. Stanford also relied on a conversation with Walter Jones, whom he has long known, and whom he knew to be a long-time Milwaukee journalist. Mr. Stanford says he considers Walter Jones to be an excellent reporter with an outstanding reputation for truthfulness.

This personal experience and supplemental research into the archives of the newspaper form the basis for Mr. Stanford's statements in his May 5, 1993, column.

Mr. Milsap complains of the following statements occurring in that column:

[S]he ran Milsap out of town.

Jim Milsap was a fast talker....

Inner City Hall officials wanted her to go away....

It seems he was fired from his anti-poverty job where there may have been financial irregularities. And nobody knew where the money was coming from for the hall or his Cadillac.[2]

Into that frenetic operation one day walked a short, handsome woman with a pen and a pad and a host of nagging questions nobody wanted to answer.

The Journal and Sentinel followed the Courier's lead. Inner City Hall and The Torch were short-lived.

Mr. Milsap's best cause of action is for defamation. The others merit only brief mention here. What Mr. Milsap complains of is the content of the column. It is that bit of communication which has caused the injury. In that situation, a plaintiff cannot substitute other torts for the tort of defamation. *See Jimenez–Nieves v. United States,* 682 F.2d 1 (1st Cir.1982).

To the extent that some of the claims, other than the defamation claim, seem to relate to events of the late 1960's, rather than the 1993 column itself, they are time-barred. *See* §§ 893.53, 893.54, 893.57, and 893.93(1)(b), Wisconsin Statutes.

■ In addition, the conspiracy claim, whether it is based on common law or on 42 U.S.C. § 1981 or 1985(3), fails. For one thing, allegations of conspiracy between an employer and its employees are not sufficient under Wisconsin law. *See Elbe v. Wausau Hospital Center,* 606 F.Supp. 1491 (W.D.Wis. 1985). His allegations under federal law are insufficient under *Bray v. Alexandria Women's Health Clinic,* —— U.S. ——, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993).

■ Similarly, the fraud allegations fail. They are not pled with particularity as required by rule 9(b) of the Federal Rules of Civil Procedure. Neither does he state a claim for invasion of privacy; he does not meet the requirement of § 895.50(2)(a), Wis. Stat. Finally, a claim for emotional distress requires that the conduct be intentional, that it be extreme and outrageous, that it was a cause-in-fact of the injury, and that the plaintiff suffered an extreme disabling emotional response. *Alsteen v. Gehl,* 21 Wis.2d 349, 124 N.W.2d 312 (1963). Mr. Milsap does not allege that he suffered an extreme disabling response, and the conduct is not, as a matter of law, extreme and outrageous.

**2.** Parts of this quotation are considered twice in the complaint.

That leaves the defamation claim—which is what this case is all about. For a number of reasons, that claim also fails. First and foremost, Mr. Milsap was a limited purpose public figure, who cannot show actual malice, as required. Secondly, many of the statements are protected as statements of opinion, or they are not defamatory at all, or they are not directed at Mr. Milsap, but rather at other entities.

■ I find that Mr. Milsap was a limited purpose public figure. Mr. Milsap's actions in Milwaukee in the late 1960's made him that. He therefore has no claim for defamation unless he can show actual malice by Mr. Stanford or the other defendants in publishing the May 5, 1993, column. That is, Mr. Milsap must show by clear and convincing evidence that Mr. Stanford or his colleagues knew the column was false, or didn't care whether it was. He cannot meet that burden.

Whether Mr. Milsap is a public figure for purposes of his defamation action is a decision for the court. *Rosenblatt v. Baer,* 383 U.S. 75, 88, 86 S.Ct. 669, 677, 15 L.Ed.2d 597 (1966). His activities satisfy the three-step inquiry used to determine whether a person is a limited purpose public figure. The three steps include:

1. Isolating the controversy;
2. Determining that the plaintiff's role in the controversy is more than trivial or tangential; and
3. Ascertaining if the alleged defamation is germane to the plaintiff's participation in the controversy.

*Van Straten v. Milwaukee Journal,* 151 Wis.2d 905, 913, 447 N.W.2d 105 (Ct.App. 1989), *cert. denied,* 496 U.S. 929, 110 S.Ct. 2626, 110 L.Ed.2d 646 (1990).

A court must first determine the scope of the controversy, because it defines the scope of Mr. Milsap's public personality. The scope of the controversy in this case involves Mr. Milsap's hiring, tenure, and departure from GMOIC, and his related and subsequent activities in the community.

As to the second element, Mr. Milsap's role in that controversy was obviously central. At GMOIC and in his community activities, he was the key figure. The controversy centered around him. Certainly at GMOIC, Mr. Milsap was not only central to the controversy, he *was* the controversy. Newspaper reports from that time show that he organized a mock trial and "prosecuted" the City of Milwaukee, trying in a most public way to address certain issues of race and discrimination. He tried to reverse the city's decision on a park contract. He spoke out against those who criticized his handling of the GMOIC. He used his Inner City Hall to promote Senator McCarthy as a candidate for President.

As to the third prong, statements from the 1993 column that Mr. Milsap now alleges are defamatory grew directly out of his activities at GMOIC and in the community. Even though the events Mr. Stanford described took place more than 25 years ago, Mr. Milsap's status as a public figure, at least for those events, continues. All the comments about which he complains refer to the days when he was directing GMOIC, fighting his ouster, or moving into new forms of community involvement. Without the GMOIC disputes or his community activities there would have been no controversy, and without the controversy Mr. Stanford would not have mentioned Mr. Milsap in his 1993 column. Mr. Milsap is a limited purpose public figure.

■ As such, to sustain a defamation action he must prove by clear and convincing evidence that the statements about which he complains were made with "actual malice." *New York Times Co. v. Sullivan,* 376 U.S. 254, 285–86, 84 S.Ct. 710, 728–729, 11 L.Ed.2d 686 (1964). His elevated burden of proof must be taken into account in considering a summary judgment motion. *Anderson,* 477 U.S. at 255–56, 106 S.Ct. at 2514.

■ To show actual malice, Mr. Milsap must show by clear and convincing evidence that the statements were made "with knowledge that [they were] false or with reckless disregard of whether [they were] false or not." *New York Times Co. v. Sullivan,* 376 U.S. at 279–80, 84 S.Ct. at 725–26. The *New York Times* standard of actual malice is not the same as an evil intent. Instead, actual malice is a subjective standard which must

be met by something more than evidence suggesting the defendant lacked reasonable grounds. Mr. Milsap must show that Mr. Stanford or his employers "in fact entertained serious doubts" about the truth of Mr. Stanford's comments. *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1326, 20 L.Ed.2d 262 (1968). Whether the evidence is sufficient to support a finding of actual malice is a question of law. *Harte–Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 685, 109 S.Ct. 2678, 2694, 105 L.Ed.2d 562 (1989).

■ Mr. Stanford's actions show that in preparing his column, he did not disregard the truth, but in fact sought the truth. First, he relied on news clippings from the *Journal* and *Sentinel* files about the events surrounding Mr. Milsap in the late 1960's. Second, he spoke with Walter Jones, a news source he had known for years and whom he considered to be accurate and reliable. Third, Mr. Stanford relied on his own personal recollections and involvement in the events he wrote about in his column. He was on the scene in the late 1960's. He knew of Milsap then and reported on his activities. Mr. Stanford says that he witnessed the events he described involving Ms. Malone. Mr. Milsap cannot show actual malice.

In addition, some of the statements could not, by any stretch, be considered defamatory. In determining whether a statement is capable of a defamatory meaning,

> the words must be reasonably interpreted and must be construed in the plain and popular sense in which they would naturally be understood in the context in which they were used and under the circumstances they were uttered.

*Frinzi v. Hanson*, 30 Wis.2d 271, 275, 140 N.W.2d 259, 261 (1966).

■ A court must decide as a matter of law whether a pleaded statement is capable of a defamatory meaning. *Hoan v. Journal Co.*, 238 Wis. 311, 329, 298 N.W. 228 (1941), *cert. denied*, 314 U.S. 683, 62 S.Ct. 187, 86 L.Ed. 547. If it is not, "that ends the matter," and a motion to dismiss must be sustained. *Lathan v. Journal Co.*, 30 Wis.2d 146, 151, 140 N.W.2d 417 (1966).

■ ˙ One of the statements Mr. Milsap complains about is "Jim Milsap was a fast talker . . . ." In context, the statement is:

> The heady late 1960s. *Jim Milsap was a fast talker* who generated excitement. He ran a job training program. But he had loftier plans. He opened Inner City Hall on Center St. A sign in the window listed the population of the Inner City and said it was the state's second biggest city. Was Milsap the mayor? The facility was intended to provide services, including a newspaper called The Torch.

(Emphasis added.)

Taken in context, these words portray Mr. Milsap as an energetic man. They are complimentary rather than defamatory. Even less defamatory is the following:

> Into that frenetic operation one day walked a short, handsome woman with a pen and a pad and a host of nagging questions nobody wanted to answer.

These words say nothing at all about Mr. Milsap. Nor do the following:

> Inner City Hall officials wanted her to go away . . . .

Or the following:

> The Journal and Sentinel followed The Courier's lead. Inner City Hall and The Torch were short-lived.

■ Finally, statements of opinion are protected. The entire piece, of course, is on the editorial page and is clearly marked as opinion. It is "My Turn" by Mr. Stanford. Specifically, the statement which would be most offensive is the following:

> It seems he was fired from his anti-poverty job, where there may have been financial irregularities. And nobody knew where the money was coming from for the hall or his Cadillac. (No mystery, if my case was typical. He simply reneged on paying people.)

Mr. Stanford, in effect, says he, personally, was not paid by Mr. Milsap and suggests that other people *may* not have been paid either. He does not say it as a fact, merely a possible explanation. The statement is not what one would want to read about himself, but neither is it defamatory. The motion of

the defendants is granted. Nothing is added to this case by Mr. Milsap's motion to amend the complaint, and that is therefore denied.

IT IS THEREFORE ORDERED that the motion of the defendants for dismissal, or summary judgment, is GRANTED. This action is DISMISSED.

# Her generous spirit lives on

**GREGORY D. STANFORD**

A HIGHLIGHT OF Carole Malone's journalism career, recalls her one-time editor, Walter Jones, was that "she ran Milsap out of town."

The heady late 1960s. Jim Milsap was a fast talker who generated excitement. He ran a job training program. But he had loftier plans. He opened Inner City Hall on Center St. A sign in the window listed the population of the Inner City and said it was the state's second biggest city. Was Milsap the mayor? The facility was intended to provide services, including a newspaper called The Torch.

My cue, stage left. I was a naive college student who was simply trying, in the spirit of the age, to ply my craft in behalf of my people, so I hooked up with The Torch.

Into that frenetic operation one day walked a short, handsome woman with a pen and a pad and a host of nagging questions nobody wanted to answer. She was from an established, competing newspaper, The Milwaukee Courier. Inner City Hall officials wanted her to go away, but she stood her ground.

Thus, I first espied Carole Malone.

She ran exposes in The Courier on Milsap. It seems he was fired from his anti-poverty job, where there may have been financial irregularities. And nobody knew where the money was coming from for the hall or his Cadillac. (No mystery, if my case was typical. He simply reneged on paying people.) The Journal and Sentinel followed The Courier's lead. Inner City Hall and The Torch were short-lived.

The recollections abound. The memory of Carole sticks with the people she encountered. I brought out her caustic side. She's the only person since I've stopped being skinny to have dared called me "fatso." But the taunts, while admittedly unnerving, weren't mean; they were playful.

More than anything, though, Carole nurtured. As the Rev. Nathaniel Stampley put it at the funeral service Tuesday, "She was our mentor. She was our teacher."

LaDonna Susberry is a case in point. She would not have been an engineer at Channel 4 these 10 years had Carole not intervened. LaDonna hadn't considered a television career when Carole reached out to the high school student, enrolling her in the broadcasting workshop Carole was running at the public television station. She further coaxed LaDonna into enrolling after high school graduation in a two-year broadcast-engineering curriculum at Milwaukee Area Technical College. And Carole continued to give LaDonna support.

LaDonna wasn't all that special, or, rather, droves of young people were special with Carole. Many got the treatment LaDonna got.

As the Rev. Tommie Novick put it at the service, "Her concern was not only her children, but everybody's children."

Theresa Hadnot, now assistant marketing director for Capitol Court recalls Carole coming into her junior high school to mentor. A later image sticks out: "She was like this short woman in a crowd of giants. Her hair was waving in the wind. And she was angrily trying to cajole and coerce people to protest the Ernest Lacy death."

Yes, that was Carole, outraged over an injustice, this one the death of a young black man in custody for a rape he had not committed.

Walter Jones remembers Carole for her big ideas, for her eternal optimism. She helped engineer a black political convention in Milwaukee. She had expansive plans for The Racine Courier, which she edited. Walter and Carole teamed up to form a public relations firm.

Funny, when thinking of Carole, who's now dead at 55, I often forget her frame was so small — so large loomed her spirit; so large looms her spirit.

*Gregory D. Stanford is a Journal editorial*