# HUTCHINSON *v.* PROXMIRE ET AL.

No. 78–680. Argued April 17, 1979—Decided June 26, 1979

112

BURGER, C. J., delivered the opinion of the Court, in which WHITE, MARSHALL, BLACKMUN, POWELL, REHNQUIST, and STEVENS, JJ., joined, and in all but n. 10 of which STEWART, J., joined. STEWART, J., filed a statement concurring in part and dissenting in part, *post,* p. 136. BRENNAN, J., filed a dissenting opinion, *post,* p. 136.

*Michael E. Cavanaugh* argued the cause and filed briefs for petitioner.

*Alan Raywid* argued the cause and filed a brief for respondents.*

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted certiorari, 439 U. S. 1066 (1979), to resolve three issues: (1) Whether a Member of Congress is protected by the Speech or Debate Clause of the Constitution, Art. I, § 6, against suits for allegedly defamatory statements made by the Member in press releases and newsletters; (2) whether petitioner Hutchinson is either a "public figure" or a "public official," thereby making applicable the "actual malice" standard of *New York Times Co.* v. *Sullivan,* 376 U. S. 254 (1964); and (3) whether respondents were entitled to summary judgment.

---

*Bruce J. Montgomery* and *John D. Lane* filed a brief for the American Psychological Association et al. as *amici curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed by *Richard M. Schmidt, Jr.,* for the American Society of Newspaper Editors et al.; and by *Chester H. Smith* for Warren G. Magnuson et al.

*Stanley M. Brand* filed a brief for Thomas P. O'Neill, Jr., Speaker of the United States House of Representatives, et al. as *amici curiae.*

Ronald Hutchinson, a research behavioral scientist, sued respondents, William Proxmire, a United States Senator, and his legislative assistant, Morton Schwartz, for defamation arising out of Proxmire's giving what he called his "Golden Fleece" award. The "award" went to federal agencies that had sponsored Hutchinson's research. Hutchinson alleged that in making the award and publicizing it nationwide, respondents had libeled him, damaging him in his professional and academic standing, and had interfered with his contractual relations. The District Court granted summary judgment for respondents and the Court of Appeals affirmed.

We reverse and remand to the Court of Appeals for further proceedings consistent with this opinion.

I

Respondent Proxmire is a United States Senator from Wisconsin. In March 1975, he initiated the "Golden Fleece of the Month Award" to publicize what he perceived to be the most egregious examples of wasteful governmental spending. The second such award, in April 1975, went to the National Science Foundation, the National Aeronautics and Space Administration, and the Office of Naval Research, for spending almost half a million dollars during the preceding seven years to fund Hutchinson's research.[1]

At the time of the award, Hutchinson was director of research at the Kalamazoo State Mental Hospital. Before that he had held a similar position at the Ft. Custer State Home. Both the hospital and the home are operated by the Michigan State Department of Mental Health; he was therefore a state employee in both positions. During most of the period in question he was also an adjunct professor at Western Michigan University. When the research department at Kalama-

---

[1] There is disagreement over the actual total. The speech said the total was "over $500,000." In preparation for trial, both sides have offered higher estimates of the total amount.

zoo State Mental Hospital was closed in June 1975, Hutchinson became research director of the Foundation for Behavioral Research, a nonprofit organization. The research funding was transferred from the hospital to the foundation.

The bulk of Hutchinson's research was devoted to the study of emotional behavior. In particular, he sought an objective measure of aggression, concentrating upon the behavior patterns of certain animals, such as the clenching of jaws when they were exposed to various aggravating stressful stimuli.[2] The National Aeronautics and Space Agency and the Navy were interested in the potential of this research for resolving problems associated with confining humans in close quarters for extended periods of time in space and undersea exploration.

The Golden Fleece Award to the agencies that had sponsored Hutchinson's research was based upon research done for Proxmire by Schwartz. While seeking evidence of wasteful governmental spending, Schwartz read copies of reports that Hutchinson had prepared under grants from NASA. Those reports revealed that Hutchinson had received grants from the Office of Naval Research, the National Science Foundation, and the Michigan State Department of Mental Health. Schwartz also learned that other federal agencies had funded Hutchinson's research. After contacting a number of federal and state agencies, Schwartz helped to prepare a speech for Proxmire to present in the Senate on April 18, 1975; the text was then incorporated into an advance press release, with only

---

[2] Reports of Hutchinson's research were published in scientific journals. The research is not unlike the studies of primates reported in less technical periodicals such as the National Geographic. *E. g.*, Fossey, More Years with Mountain Gorillas, 140 National Geographic 574 (1971); Galdikas-Brindamour, Orangutans, Indonesia's "People of the Forest," 148 National Geographic 444 (1975); Goodall, Life and Death at Gombe, 155 National Geographic 592 (1979); Goodall, My Life Among Wild Chimpanzees, 124 National Geographic 272 (1963); Strum, Life With the "Pumphouse Gang": New Insights into Baboon Behavior, 147 National Geographic 672 (1975).

the addition of introductory and concluding sentences. Copies were sent to a mailing list of 275 members of the news media throughout the United States and abroad.

Schwartz telephoned Hutchinson before releasing the speech to tell him of the award; Hutchinson protested that the release contained an inaccurate and incomplete summary of his research. Schwartz replied that he thought the summary was fair.

In the speech, Proxmire described the federal grants for Hutchinson's research, concluding with the following comment: [3]

> "The funding of this nonsense makes me almost angry enough to scream and kick or even clench my jaw. It seems to me it is outrageous.
>
> "Dr. Hutchinson's studies should make the taxpayers as well as his monkeys grind their teeth. In fact, the good doctor has made a fortune from his monkeys and in the process made a monkey out of the American taxpayer.
>
> "It is time for the Federal Government to get out of this 'monkey business.' In view of the transparent worthlessness of Hutchinson's study of jaw-grinding and biting by angry or hard-drinking monkeys, it is time we put a stop to the bite Hutchinson and the bureaucrats who fund him have been taking of the taxpayer." 121 Cong. Rec. 10803 (1975).

---

[3] Proxmire is not certain that he actually delivered the speech on the Senate floor. He said that he might have merely inserted it into the Congressional Record. App. 220–221. In light of that uncertainty, the question arises whether a nondelivered speech printed in the Congressional Record is covered by the Speech or Debate Clause. This Court has never passed on that question and neither the District Court nor the Court of Appeals seemed to think it was important. Nevertheless, we assume, without deciding, that a speech printed in the Congressional Record carries immunity under the Speech or Debate Clause as though delivered on the floor.

In May 1975, Proxmire referred to his Golden Fleece Awards in a newsletter sent to about 100,000 people whose names were on a mailing list that included constituents in Wisconsin as well as persons in other states. The newsletter repeated the essence of the speech and the press release. Later in 1975, Proxmire appeared on a television interview program where he referred to Hutchinson's research, though he did not mention Hutchinson by name.[4]

The final reference to the research came in a newsletter in February 1976. In that letter, Proxmire summarized his Golden Fleece Awards of 1975. The letter did not mention Hutchinson's name, but it did report:

"— The NSF, the Space Agency, and the Office of Naval Research won the 'Golden Fleece' for spending jointly $500,000 to determine why monkeys clench their jaws.

. . . . .

"All the studies on why monkeys clench their jaws were dropped. No more monkey business." App. 168–171.

After the award was announced, Schwartz, acting on behalf of Proxmire, contacted a number of the federal agencies that had sponsored the research. In his deposition he stated that he did not attempt to dissuade them from continuing to fund the research but merely discussed the subject.[5] Hutchinson, by contrast, contends that these calls were intended to persuade the agencies to terminate his grants and contracts.

---

[4] The parties agree that Proxmire referred to research like Hutchinson's on at least one television show. They do not agree whether there were other appearances on either radio or television. Hutchinson has suggested that there were others and has produced affidavits to support his suggestion. Proxmire cannot recall any others.

[5] Senate Resolution 543, 94th Cong., 2d Sess. (1976), authorized respondents and an additional member of Proxmire's staff to give deposition testimony. 122 Cong. Rec. 29876 (1976).

## II

On April 16, 1976, Hutchinson filed this suit in United States District Court in Wisconsin.[6] In Count I he alleges that as a result of the actions of Proxmire and Schwartz he has "suffered a loss of respect in his profession, has suffered injury to his feelings, has been humiliated, held up to public scorn, suffered extreme mental anguish and physical illness and pain to his person. Further, he has suffered a loss of income and ability to earn income in the future." Count II alleges that the respondents' conduct has interfered with Hutchinson's contractual relationships with supporters of his research. He later amended the complaint to add an allegation that his rights of privacy and peace and tranquility have been infringed.

Respondents moved for a change of venue and for summary judgment. In their motion for summary judgment they asserted that all of their acts and utterances were protected by the Speech or Debate Clause. In addition, they asserted that their criticism of the spending of public funds was privileged under the Free Speech Clause of the First Amendment. They argued that Hutchinson was both a public figure and a public official, and therefore would be obliged to prove the existence of "actual malice." Respondents contended that the facts of this case would not support a finding of actual malice.

Without ruling on venue, the District Court granted respondents' motion for summary judgment. 431 F. Supp. 1311 (WD Wis. 1977). In so ruling, the District Court relied on both grounds urged by respondents. It reasoned that the Speech or Debate Clause afforded absolute immunity for respondents' activities in investigating the funding of Hutchinson's research, for Proxmire's speech in the Senate, and for the press release covering the speech. The court concluded that the investigations and the speech were clearly within the

---

[6] On April 13, 1976, Hutchinson had written to Proxmire requesting that he retract certain erroneous statements made in the 1975 press release.

ambit of the Clause. The press release was said to be protected because it fell within the "informing function" of Congress. To support its conclusion, the District Court relied upon cases interpreting the franking privilege granted to Members by statute. See 39 U. S. C. § 3210.

Although the District Court referred to the "informing function" of Congress and to the franking privilege, it did not base its conclusion concerning the press release on those analogies. Instead, the District Court held that the "press release, in a constitutional sense, was no different than would have been a television or radio broadcast of his speech from the Senate floor." [7] 431 F. Supp., at 1325. That the District Court did not rely upon the "informing function" is clear from its implicit holding that the newsletters were not protected.

The District Court then turned to the First Amendment to explain the grant of summary judgment on the claims arising from the newsletters and interviews. It concluded that Hutchinson was a public figure for purposes of determining respondents' liability:

> "Given Dr. Hutchinson's long involvement with publicly-funded research, his active solicitation of federal and state grants, the local press coverage of his research, and the public interest in the expenditure of public funds on the precise activities in which he voluntarily participated, the court concludes that he is a public figure for the purpose of this suit. As he acknowledged in his deposition, 'Certainly, any expenditure of public funds is a matter of public interest.' " *Id.,* at 1327.[8]

---

[7] Of course, in light of Proxmire's uncertainty, see n. 3, *supra,* there is no assurance that there even was a speech on the Senate floor.

[8] The District Court also concluded that Hutchinson was a "public official." 431 F. Supp., at 1327–1328. The Court of Appeals did not decide whether that conclusion was correct. 579 F. 2d 1027, 1035 n. 14 (CA7 1978). We therefore express no opinion on the issue. The Court has not provided precise boundaries for the category of "public official"; it cannot be thought to include all public employees, however.

Having reached that conclusion, the District Court relied upon the depositions, affidavits, and pleadings before it to evaluate Hutchinson's claim that respondents had acted with "actual malice." The District Court found that there was no genuine issue of material fact on that issue. It held that neither a failure to investigate nor unfair editing and summarizing could establish "actual malice." It also held that there was nothing in the affidavits or depositions of either Proxmire or Schwartz to indicate that they ever entertained any doubt about the truth of their statements. Relying upon cases from other courts, the District Court said that in determining whether a plaintiff had made an adequate showing of "actual malice," summary judgment might well be the rule rather than the exception. *Id.*, at 1330.[9]

Finally, the District Court concluded:

"But even if for the purpose of this suit it is found that Dr. Hutchinson is a private person so that First Amendment protections do not extend to [respondents], relevant state law dictates the grant of summary judgment." *Ibid.*

The District Court held that the controlling state law was either that of Michigan or that of the District of Columbia. Without deciding which law would govern under Wisconsin's choice-of-law principles, the District Court concluded that Hutchinson would not be able to recover in either jurisdiction.

The Court of Appeals affirmed, holding that the Speech or Debate Clause protected the statements made in the press re-

---

[9] Considering the nuances of the issues raised here, we are constrained to express some doubt about the so-called "rule." The proof of "actual malice" calls a defendant's state of mind into question, *New York Times Co.* v. *Sullivan*, 376 U. S. 254 (1964), and does not readily lend itself to summary disposition. See 10 C. Wright & A. Miller, Federal Practice and Procedure § 2730, pp. 590–592 (1973). Cf. *Herbert* v. *Lando*, 441 U. S. 153 (1979). In the present posture of the case, however, the propriety of dealing with such complex issues by summary judgment is not before us.

lease and in the newsletters. 579 F. 2d 1027 (CA7 1978). It interpreted *Doe* v. *McMillan,* 412 U. S. 306 (1973), as recognizing a limited protection for the "informing function" of Congress and concluded that distribution of both the press release and the newsletters did not exceed what was required for legislative purposes. 579 F. 2d, at 1033. The followup telephone calls and the statements made by Proxmire on television and radio were not protected by the Speech or Debate Clause; they were, however, held by the Court of Appeals to be protected by the First Amendment.[10] It reached that conclusion after first finding that, based on the affidavits and pleadings of record, Hutchinson was a "public figure." *Id.,* at 1034–1035. The court then examined the record to determine whether there had been a showing by Hutchinson of "actual malice." It agreed with the District Court "that, upon this record, there is no question that [respondents] did not have knowledge of the actual or probable 'falsity' of their statements." *Id.,* at 1035. The Court of Appeals also rejected Hutchinson's argument that the District Court had erred in granting summary judgment on the claimed wrongs other than defamation—interference with

---

[10] Respondents did not cross petition; neither did they argue that the Speech or Debate Clause protected the followup telephone calls made by Schwartz to governmental agencies or the television and radio interviews of Proxmire. Instead, respondents relied only upon the protection afforded by the First Amendment. In light of our conclusion, *infra,* that Hutchinson is not a public figure, respondents would nevertheless be entitled to raise the Speech or Debate Clause as an alternative ground for supporting the judgment. From our conclusion, *infra,* that the Speech or Debate Clause does not protect the republication of libelous remarks, it follows that libelous remarks in the followup telephone calls to executive agencies and in the television and radio interviews are not protected. Regardless of whether and to what extent the Speech or Debate Clause may protect calls to federal agencies seeking information, it does not protect attempts to influence the conduct of executive agencies or libelous comments made during the conversations. Cf. *United States* v. *Johnson,* 383 U. S. 169, 172 (1966); *United States* v. *Brewster,* 408 U. S. 501, 512–513 (1972).

contractual relations, intentional infliction of emotional anguish, and invasion of privacy:

"We view these additional allegations of harm as merely the results of the statements made by the defendants. If the alleged defamatory falsehoods themselves are privileged, it would defeat the privilege to allow recovery for the specified damages which they cause." *Id.*, at 1036 (footnote omitted).[11]

The Court of Appeals did not review the District Court's holding that state law also justified summary judgment for respondents.

### III

The petition for certiorari raises three questions. One involves the scope of the Speech or Debate Clause; another involves First Amendment claims; a third concerns the appropriateness of summary judgment, embracing both a constitutional issue and a state-law issue. The constitutional issue arose from the District Court's view that solicitude for the First Amendment required a more hospitable judicial attitude toward granting summary judgment in a libel case. See n. 9, *supra*. The state-law issue arose because the District Court concluded that, as a matter of local law, Hutchinson could not recover.

Our practice is to avoid reaching constitutional questions if a dispositive nonconstitutional ground is available. See, *e. g.*, *Siler* v. *Louisville & Nashville R. Co.*, 213 U. S. 175, 193 (1909). Were we to follow that course here we would remand to the Court of Appeals to review the state-law question which it did not consider. If the District Court correctly decided the state-law question, resolution of the First Amendment issue would be unnecessary. We conclude, however, that special considerations in this case mandate that we first resolve the constitutional questions.

---

[11] Petitioner has not sought review of this conclusion; we express no opinion as to its correctness.

The purpose of the Speech or Debate Clause is to protect Members of Congress "not only from the consequences of litigation's results but also from the burden of defending themselves." *Dombrowski* v. *Eastland,* 387 U. S. 82, 85 (1967). See also *Eastland* v. *United States Servicemen's Fund,* 421 U. S. 491, 503 (1975). If the respondents have immunity under the Clause, no other questions need be considered for they may "not be questioned in any other Place."

Ordinarily, consideration of the constitutional issue would end with resolution of the Speech or Debate Clause question. We would then remand for the Court of Appeals to consider the issue of state law. Here, however, there is an indication that the Court of Appeals would not affirm the state-law holding. We surmise this because, in explaining its conclusion that the press release and the newsletters were protected by the Speech or Debate Clause, the Court of Appeals stated: "[T]he statements in the press release intimating that Dr. Hutchinson had made a personal fortune and that the research was 'perhaps duplicative' may be defamatory falsehoods." 579 F. 2d, at 1035 n. 15. In light of that surmise, what we said in *Wolston* v. *Reader's Digest Assn., Inc., post,* at 161 n. 2, is also appropriate here: "We assume that the Court of Appeals is as familiar as we are with the general principle that dispositive issues of statutory and local law are to be treated before reaching constitutional issues. . . . We interpret the footnote to the Court of Appeals opinion in this case, where jurisdiction is based upon diversity of citizenship, to indicate its view that . . . the appeal could not be decided without reaching the constitutional question." In light of the necessity to do so, we therefore reach the First Amendment issue as well as the Speech or Debate Clause question.

## IV

In support of the Court of Appeals holding that newsletters and press releases are protected by the Speech or Debate Clause, respondents rely upon both historical precedent and

present-day congressional practices. They contend that impetus for the Speech or Debate Clause privilege in our Constitution came from the history of parliamentary efforts to protect the right of members to criticize the spending of the Crown and from the prosecution of a Speaker of the House of Commons for publication of a report outside of Parliament. Respondents also contend that in the modern day very little speech or debate occurs on the floor of either House; from this they argue that press releases and newsletters are necessary for Members of Congress to communicate with other Members. For example, in his deposition Proxmire testified:

> "I have found in 19 years in the Senate that very often a statement on the floor of the Senate or something that appears in the Congressional Record misses the attention of most members of the Senate, and virtually all members of the House, because they don't read the Congressional Record. If they are handed a news release, or something, that is going to call it to their attention . . . ." App. 220.

Respondents also argue that an essential part of the duties of a Member of Congress is to inform constituents, as well as other Members, of the issues being considered.

The Speech or Debate Clause has been directly passed on by this Court relatively few times in 190 years. *Eastland* v. *United States Servicemen's Fund, supra; Doe* v. *McMillan,* 412 U. S. 306 (1973); *Gravel* v. *United States,* 408 U. S. 606 (1972); *United States* v. *Brewster,* 408 U. S. 501 (1972); *Dombrowski* v. *Eastland, supra; United States* v. *Johnson,* 383 U. S. 169 (1966); *Kilbourn* v. *Thompson,* 103 U. S. 168 (1881). Literal reading of the Clause would, of course, confine its protection narrowly to a "Speech or Debate *in* either House." But the Court has given the Clause a practical rather than a strictly literal reading which would limit the protection to utterances made within the four walls of either Chamber. Thus, we have held that committee hearings are protected, even if held outside the Chambers; committee reports are also pro-

tected. *Doe* v. *McMillan, supra; Gravel* v. *United States, supra.* Cf. *Coffin* v. *Coffin,* 4 Mass. *1, *27-*28 (1808).

The gloss going beyond a strictly literal reading of the Clause has not, however, departed from the objective of protecting only legislative activities. In Thomas Jefferson's view:

> "[The privilege] is restrained to things done in the House in a Parliamentary course . . . . For [the Member] is not to have privilege contra morem parliamentarium, to exceed the bounds and limits of his place and duty." T. Jefferson, A Manual of Parliamentary Practice 20 (1854), reprinted in The Complete Jefferson 704 (S. Padover ed. 1943).

One of the draftsmen of the Constitution, James Wilson, expressed a similar thought in lectures delivered between 1790 and 1792 while he was a Justice of this Court. He rejected Blackstone's statement, 1 W. Blackstone, Commentaries *164, that Parliament's privileges were preserved by keeping them indefinite:

> "Very different is the case with regard to the legislature of the United States . . . . The great maxims, upon which our law of parliament is founded, are defined and ascertained in our constitutions. The arcana of privilege, and the arcana of prerogative, are equally unknown to our system of jurisprudence." 2 J. Wilson, Works 35 (J. Andrews ed. 1896).[12]

In this respect, Wilson was underscoring the very purpose of our Constitution—*inter alia,* to provide *written* definitions of the powers, privileges, and immunities granted rather than rely on evolving constitutional concepts identified from diverse sources as in English law. Like thoughts were expressed

---

[12] But see T. Jefferson, A Manual of Parliamentary Practice 15–16 (1854), reprinted in The Complete Jefferson 702 (S. Padover ed. 1943) (quoting Blackstone with approval).

by Joseph Story, writing in the first edition of his Commentaries on the Constitution in 1833:

> "But this privilege is strictly confined to things done in the course of parliamentary proceedings, and does not cover things done beyond the place and limits of duty." *Id.*, § 863, at 329.

Cf. *Coffin* v. *Coffin, supra,* at *34.

In *United States* v. *Brewster, supra,* we acknowledged the historical roots of the Clause going back to the long struggle between the English House of Commons and the Tudor and Stuart monarchs when both criminal and civil processes were employed by Crown authority to intimidate legislators. Yet we cautioned that the Clause

> "must be interpreted in light of the American experience, and in the context of the American constitutional scheme of government rather than the English parliamentary system. . . . [T]heir Parliament is the supreme authority, not a coordinate branch. Our speech or debate privilege was designed to preserve legislative independence, not supremacy." 408 U. S., at 508.

Nearly a century ago, in *Kilbourn* v. *Thompson, supra,* at 204, this Court held that the Clause extended "to things generally done *in a session* of the House by one of its members *in relation to the business before it.*" (Emphasis added.) More recently we expressed a similar definition of the scope of the Clause:

> "Legislative acts are not all-encompassing. The heart of the Clause is speech or debate in either House. Insofar as the Clause is construed to reach other matters, *they must be an integral part of the deliberative and communicative processes* by which Members participate *in committee and House proceedings* with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House. As the

Court of Appeals put it, the courts have extended the privilege to matters beyond pure speech or debate in either House, but 'only when necessary to prevent indirect impairment of such deliberations.' " *Gravel* v. *United States,* 408 U. S., at 625 (quoting *United States* v. *Doe,* 455 F. 2d 753, 760 (CA1 1972)) (emphasis added).

Cf. *Doe* v. *McMillan,* 412 U. S., at 313–314, 317; *United States* v. *Brewster,* 408 U. S., at 512, 515–516, 517–518; *Long* v. *Ansell,* 293 U. S. 76, 82 (1934).

Whatever imprecision there may be in the term "legislative activities," it is clear that nothing in history or in the explicit language of the Clause suggests any intention to create an absolute privilege from liability or suit for defamatory statements made outside the Chamber. In *Brewster, supra,* at 507, we observed:

"The immunities of the Speech or Debate Clause were not written into the Constitution simply for the personal or private benefit of Members of Congress, but to protect the integrity of the legislative process by insuring the independence of individual legislators."

Claims under the Clause going beyond what is needed to protect legislative independence are to be closely scrutinized. In *Brewster* we took note of this:

"The authors of our Constitution were well aware of the history of both the need for the privilege *and the abuses that could flow from too sweeping safeguards.* In order to preserve other values, they wrote the privilege so that it tolerates and protects behavior on the part of Members not tolerated and protected when done by other citizens, *but the shield does not extend beyond what is necessary to preserve the integrity of the legislative process.*" 408 U. S., at 517 (emphasis added).

Indeed, the precedents abundantly support the conclusion that a Member may be held liable for republishing defamatory

statements originally made in either House. We perceive no basis for departing from that long-established rule.

Mr. Justice Story in his Commentaries, for example, explained that there was no immunity for republication of a speech first delivered in Congress:

"Therefore, although a speech delivered in the house of commons is privileged, and the member cannot be questioned respecting it elsewhere; *yet, if he publishes his speech, and it contains libellous matter, he is liable to an action and prosecution therefor, as in common cases of libel.* And the same principles seem applicable to the privilege of debate and speech in congress. No man ought to have a right to defame others under colour of a performance of the duties of his office. And if he does so *in the actual discharge of his duties in congress, that furnishes no reason, why he should be enabled through the medium of the press to destroy the reputation, and invade the repose of other citizens.* It is neither within the scope of his duty, nor in furtherance of public rights, or public policy. Every citizen has as good a right to be protected by the laws from malignant scandal, and false charges, and defamatory imputations, as a member of congress has to utter them in his seat." [13] 2 J. Story, Com-

---

[13] Story acknowledged the arguments to the contrary: "It is proper, however, to apprise the learned reader, that it has been recently denied in congress by very distinguished lawyers, that the privilege of speech and debate in congress does not extend to publication of his speech. And they ground themselves upon an important distinction arising from the actual differences between English and American legislation. In the former, the publication of the debates is not strictly lawful, except by license of the house. In the latter, it is a common right, exercised and supported by the direct encouragement of the body. This reasoning deserves a very attentive examination." 2 J. Story, Commentaries on the Constitution § 863, pp. 329–330 (1833).

At oral argument, counsel for respondents referred to a note in the fifth edition of the Commentaries saying that the Speech or Debate Clause protected the circulation to constituents of copies of speeches made in

mentaries on the Constitution § 863, p. 329 (1833) (emphasis added).

See also L. Cushing, Elements of the Law and Practice of Legislative Assemblies in the United States of America ¶ 604, p. 244 (1st ed. reprint 1971).

Story summarized the state of the common law at the time the Constitution was drafted, recalling that Parliament had by then succeeded in its struggle to secure freedom of debate. But the privilege did not extend to republication of libelous remarks even though first made in Parliament. Thus, in *King* v. *Lord Abingdon,* 1 Esp. 225, 170 Eng. Rep. 337 (N. P. 1794), Lord Chief Justice Kenyon rejected Lord Abingdon's argument that parliamentary privilege protected him from suit for republication of a speech first made in the House of Lords:

> "[A]s to the words in question, had they been spoken in the House of Lords, and confined to its walls, [the] Court would have had no jurisdiction to call his Lordship before them, to answer for them as an offence; but . . . in the present case, the offence was the publication under his authority and sanction, and at his expense: . . . a member of Parliament had certainly a right to publish his speech, but that speech should not be made the vehicle of slander against any individual; if it was, it was a libel . . . ." *Id.,* at 228, 170 Eng. Rep., at 338.

A similar result was reached in *King* v. *Creevey,* 1 M. & S. 273, 105 Eng. Rep. 102 (K. B. 1813).

---

Congress. Tr. of Oral Arg. 43. In attributing the note to Story, counsel made an understandable mistake. As explained in the preface to the fifth edition, that note was added by the editor, Melville Bigelow. The note does not appear in Story's first edition. Moreover, it is clear from the text of the note and the sources cited that Bigelow did not mean that there was an absolute privilege for defamatory remarks contained in a speech mailed to constituents as there would be if the mailing was protected by the Speech or Debate Clause. Instead, he suggested that there was a qualified privilege, akin to that for accurate newspaper reports of legislative proceedings.

In *Gravel* v. *United States,* 408 U. S., at 622–626, we recognized that the doctrine denying immunity for republication had been accepted in the United States:

> "[P]rivate publication by Senator Gravel . . . was in no way essential to the deliberations of the Senate; nor does questioning as to private publication threaten the integrity or independence of the Senate by impermissibly exposing its deliberations to executive influence." *Id.,* at 625.

We reaffirmed that principle in *Doe* v. *McMillan,* 412 U. S., at 314–315:

> "A Member of Congress may not with impunity publish a libel from the speaker's stand in his home district, and clearly the Speech or Debate Clause would not protect such an act even though the libel was read from an official committee report. The reason is that republishing a libel under such circumstances is not an essential part of the legislative process and is not part of that deliberative process 'by which Members participate in committee and House proceedings.'" (Footnote omitted; quoting from *Gravel* v. *United States, supra,* at 625.)[14]

We reach a similar conclusion here. A speech by Proxmire in the Senate would be wholly immune and would be available to other Members of Congress and the public in the Congressional Record. But neither the newsletters nor the press release was "essential to the deliberations of the Senate" and neither was part of the deliberative process.

Respondents, however, argue that newsletters and press releases are essential to the functioning of the Senate; without

---

[14] It is worth noting that the Rules of the Senate forbid disparagement of other Members on the floor. Senate Rule XIX (Apr. 1979). See also T. Jefferson, A Manual of Parliamentary Practice 40–41 (1854), reprinted in The Complete Jefferson 714–715 (S. Padover ed. 1943).

them, they assert, a Senator cannot have a significant impact on the other Senators. We may assume that a Member's published statements exert some influence on other votes in the Congress and therefore have a relationship to the legislative and deliberative process. But in *Brewster,* 408 U. S., at 512, we rejected respondents' expansive reading of the Clause:

> "It is well known, of course, that Members of the Congress engage in many activities other than the purely legislative activities protected by the Speech or Debate Clause. These include . . . preparing so-called 'news letters' to constituents, news releases, and speeches delivered outside the Congress."

There we went on to note that *United States* v. *Johnson,* 383 U. S. 169 (1966), had carefully distinguished between what is only "related to the due functioning of the legislative process," and what constitutes the legislative process entitled to immunity under the Clause:

> "In stating that those things [Johnson's attempts to influence the Department of Justice] 'in no wise related to the due functioning of the legislative process' were *not* covered by the privilege, the Court did not in any sense imply as a corollary that everything that 'related' to the office of a Member was shielded by the Clause. Quite the contrary, in *Johnson* we held, citing *Kilbourn* v. *Thompson, supra,* that only acts generally done in the course of the process of enacting legislation were protected.

> . . . . .

> "In no case has this Court ever treated the Clause as protecting all conduct *relating* to the legislative process.

> . . . . .

> ". . . In its narrowest scope, the Clause is a very large, albeit essential, grant of privilege. It has enabled reckless men to slander [by speech or debate] and even destroy

others with impunity, but that was the conscious choice of the Framers." 408 U. S., at 513–516. (Emphasis in original.)

We are unable to discern any "conscious choice" to grant immunity for defamatory statements scattered far and wide by mail, press, and the electronic media.

Respondents also argue that newsletters and press releases are privileged as part of the "informing function" of Congress. Advocates of a broad reading of the "informing function" sometimes tend to confuse two uses of the term "informing." In one sense, Congress informs itself collectively by way of hearings of its committees. It was in that sense that Woodrow Wilson used "informing" in a statement quoted by respondents. In reality, Wilson's statement related to congressional efforts to learn of the activities of the Executive Branch and administrative agencies; he did not include wide-ranging inquiries by individual Members on subjects of their choice. Moreover, Wilson's statement itself clearly implies a distinction between the *informing* function and the *legislative* function:

"Unless Congress have and use every means of acquainting itself with the acts and the disposition of the administrative agents of the government, the country must be helpless to learn how it is being served; and unless Congress both scrutinize these things and sift them by every form of discussion, the country must remain in embarrassing, crippling ignorance of the very affairs which it is most important that it should understand and direct. The informing function of Congress should be preferred even to its legislative function. . . . [T]he only really self-governing people is that people which discusses and interrogates its administration." W. Wilson, Congressional Government 303 (1885).

It is in this narrower Wilsonian sense that this Court has employed "informing" in previous cases holding that con-

gressional efforts to inform itself through committee hearings are part of the legislative function.

The other sense of the term, and the one relied upon by respondents, perceives it to be the duty of Members to tell the public about their activities. Valuable and desirable as it may be in broad terms, the transmittal of such information by individual Members in order to inform the public and other Members is not a part of the legislative function or the deliberations that make up the legislative process.[15] As a result, transmittal of such information by press releases and newsletters is not protected by the Speech or Debate Clause.

*Doe* v. *McMillan,* 412 U. S. 306 (1973), is not to the contrary. It dealt only with reports from congressional committees, and held that Members of Congress could not be held liable for voting to publish a report. Voting and preparing committee reports are the individual and collective expressions of opinion within the legislative process. As such, they are protected by the Speech or Debate Clause. Newsletters and press releases, by contrast, are primarily means of informing those outside the legislative forum; they represent the views and will of a single Member. It does not disparage either their value or their importance to hold that they are not entitled to the protection of the Speech or Debate Clause.

## V

Since *New York Times Co.* v. *Sullivan,* 376 U. S. 254 (1964),[16] this Court has sought to define the accommodation

---

[15] Provision for the use of the frank, 39 U. S. C. § 3210, does not alter our conclusion. Congress, by granting franking privileges, stationery allowances, and facilities to record speeches and statements for radio broadcast cannot expand the scope of the Speech or Debate Clause to render immune all that emanates via such helpful facilities.

[16] Neither the District Court nor the Court of Appeals considered whether the *New York Times* standard can apply to an individual defendant rather than to a media defendant. At oral argument, counsel for Hutchinson stated that he had not conceded that the *New York Times*

required to assure the vigorous debate on the public issues that the First Amendment was designed to protect while at the same time affording protection to the reputations of individuals. *E. g., Time, Inc.* v. *Firestone,* 424 U. S. 448 (1976); *Gertz* v. *Robert Welch, Inc.,* 418 U. S. 323 (1974); *Rosenbloom* v. *Metromedia, Inc.,* 403 U. S. 29 (1971); *St. Amant* v. *Thompson,* 390 U. S. 727 (1968); *Curtis Publishing Co.* v. *Butts,* 388 U. S. 130 (1967); *Rosenblatt* v. *Baer,* 383 U. S. 75 (1966). In *Gertz* v. *Robert Welch, Inc.,* the Court offered a general definition of "public figures":

> "For the most part those who attain this status [of public figure] have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment." 418 U. S., at 345.

It is not contended that Hutchinson attained such prominence that he is a public figure for all purposes. Instead, respondents have argued that the District Court and the Court of Appeals were correct in holding that Hutchinson is a public figure for the limited purpose of comment on his receipt of federal funds for research projects. That conclusion was based upon two factors: first, Hutchinson's successful application for federal funds and the reports in local newspapers of the federal grants; second, Hutchinson's access to the media, as demonstrated by the fact that some newspapers and wire services reported his response to the announcement of the Golden Fleece Award. Neither of those factors demon-

---

standard applied. Tr. of Oral Arg. 18. This Court has never decided the question; our conclusion that Hutchinson is not a public figure makes it unnecessary to do so in this case.

strates that Hutchinson was a public figure prior to the controversy engendered by the Golden Fleece Award; his access, such as it was, came after the alleged libel.

On this record, Hutchinson's activities and public profile are much like those of countless members of his profession. His published writings reach a relatively small category of professionals concerned with research in human behavior. To the extent the subject of his published writings became a matter of controversy, it was a consequence of the Golden Fleece Award. Clearly, those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure. See *Wolston* v. *Reader's Digest Assn., Inc., post,* at 167–168.

Hutchinson did not thrust himself or his views into public controversy to influence others. Respondents have not identified such a particular controversy; at most, they point to concern about general public expenditures. But that concern is shared by most and relates to most public expenditures; it is not sufficient to make Hutchinson a public figure. If it were, everyone who received or benefited from the myriad public grants for research could be classified as a public figure—a conclusion that our previous opinions have rejected. The "use of such subject-matter classifications to determine the extent of constitutional protection afforded defamatory falsehoods may too often result in an improper balance between the competing interests in this area." *Time, Inc.* v. *Firestone, supra,* at 456.

Moreover, Hutchinson at no time assumed any role of public prominence in the broad question of concern about expenditures. Neither his applications for federal grants nor his publications in professional journals can be said to have invited that degree of public attention and comment on his receipt of federal grants essential to meet the public figure level. The petitioner in *Gertz* v. *Robert Welch, Inc.,* had published books and articles on legal issues; he had been

active in local community affairs. Nevertheless, the Court concluded that his activities did not make him a public figure.

Finally, we cannot agree that Hutchinson had such access to the media that he should be classified as a public figure. Hutchinson's access was limited to responding to the announcement of the Golden Fleece Award. He did not have the regular and continuing access to the media that is one of the accouterments of having become a public figure.

We therefore reverse the judgment of the Court of Appeals and remand the case to the Court of Appeals for further proceedings consistent with this opinion.

*Reversed and remanded.*

MR. JUSTICE STEWART joins in all but footnote 10 of the Court's opinion. He cannot agree that the question whether a communication by a Congressman or a member of his staff with a federal agency is entitled to Speech or Debate Clause immunity depends upon whether the communication is defamatory. Because telephone calls to federal agency officials are a routine and essential part of the congressional oversight function, he believes such activity is protected by the Speech or Debate Clause.

MR. JUSTICE BRENNAN, dissenting.

I disagree with the Court's conclusion that Senator Proxmire's newsletters and press releases fall outside the protection of the speech-or-debate immunity. In my view, public criticism by legislators of unnecessary governmental expenditures, whatever its form, is a legislative act shielded by the Speech or Debate Clause. I would affirm the judgment below for the reasons expressed in my dissent in *Gravel* v. *United States,* 408 U. S. 606, 648 (1972).