UNPUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

VICKIE C. HUGGER; CAROLYN SETTLE,
    *Plaintiffs-Appellants,*

v.

THE RUTHERFORD INSTITUTE; THE
RUTHERFORD INSTITUTE OF NORTH
CAROLINA, INCORPORATED; JOHN W.
WHITEHEAD; STEVEN H. ADEN,
    *Defendants-Appellees.*

No. 02-1520

Appeal from the United States District Court
for the Western District of North Carolina, at Statesville.
Carl Horn, III, Chief Magistrate Judge.
(CA-00-180-5-H)

Argued: February 27, 2003

Decided: May 2, 2003

Before LUTTIG, WILLIAMS, and GREGORY, Circuit Judges.

---

Affirmed in part, reversed in part, and remanded by unpublished per curiam opinion.

---

**COUNSEL**

**ARGUED:** John Michael Logsdon, MCELWEE LAW FIRM, P.L.L.C., North Wilkesboro, North Carolina, for Appellants. Thomas Stephen Neuberger, Wilmington, Delaware, for Appellees. **ON BRIEF:** William H. McElwee, III, MCELWEE LAW FIRM, P.L.L.C., North Wilkesboro, North Carolina, for Appellants.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

## OPINION

PER CURIAM:

Vickie C. Hugger and Carolyn Settle appeal from the district court's denial of their motion to remand and its grant of summary judgment for The Rutherford Institute (TRI), The Rutherford Institute of North Carolina (TRINC),[1] John W. Whitehead, individually, and Steven H. Aden, individually, on Hugger and Settle's claims of defamation, intentional infliction of emotional distress, and negligent infliction of emotional distress. Because federal diversity jurisdiction is proper between the parties, we affirm the district court's denial of the motion to remand. Additionally, we affirm, on state law grounds, the district court's grant of summary judgment on the intentional infliction of emotional distress and negligent infliction of emotional distress claims. Because the district court erred in reaching the constitutional issue of whether Hugger and Settle are required to meet the *New York Times Co. v. Sullivan* actual malice standard before deciding the state law issue of whether sufficient evidence was proffered to establish a claim of defamation, we reverse the district court's grant of summary judgment on the defamation claim and remand for consideration of the state law issue in proceedings consistent with this opinion.

## I.

The claims in this case stem from two stories that H.D.,[2] a twelve-year old student at C.B. Eller Elementary in Wilkes County, North Carolina, told her mother about Settle, her sixth grade teacher, and Hugger, her school principal. First, H.D. told her mother that Settle

---

[1]Although the district court held that TRINC was a "sham" defendant, TRINC has not been formally dismissed as a party.

[2]Initials of minor child used pursuant to the Judicial Conference Policy on Privacy and the E-Government Act of 2002.

ordered her to read the word "damn" in front of the class even though H.D. explained that she does not say curse words for religious reasons. H.D. told her mother that when she refused, Settle sent her to Principal Hugger's office, who ordered H.D. to read the word "damn" or receive in-house suspension for the rest of the day. At that point, H.D. said, she returned to class and read the word in front of the class. Second, H.D. told her mother that Settle made her erase "WWJD"[3] and several crosses that she had drawn on the chalkboard in the "feature one student" section.

On November 8, 1999, H.D.'s mother contacted The Rutherford Institute (TRI) regarding H.D.'s stories. TRI telephoned H.D.'s mother on November 10, 1999, to obtain more information and spoke with H.D. who retold the stories and provided the name of the book that the class was reading. TRI obtained a copy of the book and confirmed that it contained the word "damn." On November 15, 1999, Whitehead, president of TRI, faxed a demand letter to the Superintendent of Wilkes County Schools and Hugger. The letter stated that "Ms. Hugger and Ms. Settle have violated [H.D.]'s First Amendment rights of free speech and religious expression." (J.A. at 95.) The letter demanded a written apology and indicated that if TRI did not receive a response by the close of business the next day, it would "seek redress for [H.D.] and her family in federal court." (J.A. at 97.)

Counsel for Wilkes County Schools immediately responded to TRI's letter, saying that he was "in the process of ascertaining the facts applicable to the incidents identified in [the] letter [and that] [a]n appropriate response [would] be issued following completion of [the] inquiry." (J.A. at 98.) On November 16, after counsel for Wilkes County Schools spoke with TRI's legal coordinator and expressed his concerns about the truthfulness of H.D.'s stories, TRI contacted H.D. again; she claimed that she had not lied and that the stories were true. H.D. provided the name of a student in her class who could confirm her story, but TRI was not able to get in touch with the student or the student's parents.

---

[3]"WWJD" stands for "What Would Jesus Do" and is a popular admonition for Christians to consider how Jesus would act as a model for their own actions.

On that same day, TRI issued a press release entitled "Sixth Grader Punished for Refusing to Curse in Class." (J.A. at 99.) The press release stated:

> John W. Whitehead, president of The Rutherford Institute, has intervened on behalf of [H.D.] and her mother . . ., with the Wilkes County School Superintendent, Dr. Joseph Johnson. Twelve-year-old [H.D.], a student at C.B. Eller Elementary School in Elkin, North Carolina, was directed by her teacher to read a portion of a book out loud in front of her classmates. When [H.D.] skipped over the word "damn" in the text and respectfully explained that she did so because of her Christian beliefs, she was sent to the principal's office. The principal then ordered [H.D.] to say the swear word or receive an in-house suspension for the remainder of the day.
>
> One week later, [H.D.] wrote "WWJD" ("What Would Jesus Do") and drew some crosses on the blackboard as part of the "feature one child" class participation program where students express themselves on the class blackboard. When her classmates left the room for lunch, however, [H.D.]'s teacher informed her that this type of information could not be displayed on the blackboard and ordered her to remove it.
>
> The Rutherford Institute has demanded that a formal written apology be sent to [H.D.] and that informational copies be sent to all district administrative and instructional personnel. In addition to the apology, The Rutherford Institute has demanded that the teacher and the principal be given a written reprimand for the incident. . . . "[H.D.]'s teacher and her principal have violated not only [H.D.]'s First Amendment rights of free speech and religious expression, but also her right not to be forced to go against her religious beliefs," said Steven H. Aden, Chief Litigation Counsel for The Rutherford Institute. . . .

(J.A. at 99.)

On November 22, 1999, H.D. admitted that she had lied about the stories. On November 23, TRI wrote a letter of apology to Hugger and Settle and, on November 24, issued a press release entitled "Rutherford Institute Expresses Regret After Fraud is Disclosed; School Girl Confesses To Fabricating A Claim Of Religious Discrimination." (J.A. at 169.)

Hugger and Settle, both citizens of North Carolina, filed a complaint in state court alleging that the demand letter and the press release were "false and impeached [them] in their character and their profession." (J.A. at 12.) Hugger and Settle alleged that "defendants had a duty . . . to make reasonable efforts to determine the truth or falsity of the allegations[,] . . . failed to conduct a reasonable investigation of the allegations of [H.D.] prior to publishing false statements to others," and acted "maliciously or with reckless disregard as to whether the statements were false." (J.A. at 12.) Hugger and Settle also alleged intentional infliction of emotional distress and negligent infliction of emotional distress.

TRI, TRINC, Whitehead, and Aden removed the case to federal court based on diversity of citizenship. Hugger and Settle moved to remand the case, arguing that because TRINC is a North Carolina corporation, there was not complete diversity between the parties and federal jurisdiction was not proper. Hugger and Settle also argued that TRI should be deemed a citizen of North Carolina based on its relationship with TRINC, which would also destroy complete diversity. The district court held that TRI is a citizen of Virginia and that TRINC was a "sham" defendant under the doctrine of fraudulent joinder, and thus, despite TRINC's North Carolina citizenship, there was complete diversity between the parties. The district court denied Hugger and Settle's motion to reconsider its jurisdictional ruling based on the citizenship of TRI.

TRI, TRINC, Whitehead, and Aden then moved for summary judgment on all three claims on the ground that the claims failed under state law and on the ground that Hugger and Settle were public officials and had not shown the required actual malice. The district court granted summary judgment to TRI, TRINC, Whitehead, and Aden on the defamation claim on the ground that Hugger and Settle were public officials and had failed to present evidence of actual malice; the

district court granted summary judgment on the intentional and negligent infliction of emotional distress claims on the grounds that the claims failed under state law and that Hugger and Settle had failed to present evidence to support the existence of actual malice. Hugger and Settle filed a timely notice of appeal of the denial of the motion to remand and of the grant of summary judgment.

II.

We first address Hugger and Settle's argument that the district court erred by denying their motion to remand the case to the state court. "[A]ny civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants . . . ." 28 U.S.C.A. § 1441(a) (West 1994). TRI, TRINC, Whitehead, and Aden based their removal on diversity jurisdiction. The district courts have original jurisdiction based on diversity over actions "where the matter in controversy exceeds the sum or value of $75,000 . . . and is between . . . citizens of different States." 28 U.S.C.A. § 1332(a) (West 1993 & Supp. 2002). The requirement that the controversy be between "citizens of different States" has been interpreted to require complete diversity between the plaintiffs and defendants. In other words, "[t]o sustain diversity jurisdiction there must exist an 'actual,' 'substantial' controversy between citizens of different states, all of whom on one side of the controversy are citizens of different states from all parties on the other side." *City of Indianapolis v. Chase Nat'l Bank*, 314 U.S. 63, 69 (1941) (internal citations omitted).

"The parties agree that the plaintiffs are citizens of North Carolina and defendants Whitehead and Aden are citizens of Virginia. The parties also agree that TRI was incorporated in Virginia and TRINC was incorporated in North Carolina." (Appellant's Br. at 11-12.) For purposes of diversity jurisdiction, "a corporation shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business." 28 U.S.C.A. § 1332(c)(1). The district court held that TRINC's North Carolina citizenship did not destroy complete diversity because TRINC was a "sham" defendant under the doctrine of fraudulent joinder. *See Wilson v. Republic Iron & Steel Co.*, 257 U.S. 92, 97 (1921) (holding that the "right of removal cannot be defeated by a fraudulent joinder of a resi-

dent defendant having no real connection with the controversy"). As Hugger and Settle "acknowledge that there is no evidence that [T]RINC independently performed any act or omission [that] would create liability for tortious conduct," (J.A. at 61), we find no error in the district court's holding that TRINC was a "sham" defendant that does not defeat removal.

Hugger and Settle also argue that TRI should be deemed to be a North Carolina citizen. The district court held that Hugger and Settle's "contention that [T]RI is a North Carolina citizen by virtue of 'reincorporation' through [T]RINC and [T]RINC's alleged 'consolidation' into [T]RI is manifestly contradicted by the undisputed facts." (J.A. at 65 n.1.) We review the finding that TRI is not a citizen of North Carolina for clear error. *Sligh v. Doe*, 596 F.2d 1169, 1171 (4th Cir. 1979) ("Citizenship . . . presents a preliminary question of fact to be determined by the trial court. Appellate review should be limited by the usual standards applicable to such determinations."). TRI is incorporated in Virginia, and is thus a citizen of Virginia. No evidence suggests, and neither party contends, that TRI was formally incorporated in North Carolina or has its principal place of business there. Hugger and Settle make two arguments why TRI should nevertheless be deemed a citizen of North Carolina.

First, they argue that TRINC was consolidated into TRI and that this consolidation gives TRI citizenship in North Carolina. They rely on *Town of Bethel v. Atlantic Coast Line Railroad Company*, 81 F.2d 60 (4th Cir. 1936), for the proposition that a consolidation results in the consolidated company being a citizen of each state in which its constituent corporations existed.

In *Town of Bethel*, we considered whether the Atlantic Coast Line Railroad Company (ACL) was a citizen of North Carolina for diversity purposes. *Id.* ACL was formed pursuant to a complicated "agreement of consolidation or merger," *id.* at 62, between many railroad companies in Virginia, North Carolina, and South Carolina, including two that were relevant to our decision, the Atlantic Coast Line Railroad Company of Virginia (ACLVA), a corporation created under the laws of Virginia and North Carolina, and the Wilmington & Weldon Railroad Company, a corporation created under the laws of North Carolina. The North Carolina enabling act, which authorized the Wil-

mington & Weldon Railroad Company to consolidate with other companies, provided that "any and all corporations consolidated, leased or organized under the provisions of this act shall be domestic corporations of North Carolina." *Id.* at 62. The agreement provided that all of the companies would be consolidated into ACLVA, and then ACLVA would change its name to ACL.

ACL argued that it was not a North Carolina citizen because what the agreement provided for was actually a merger whereby only the Virginia corporation remained. Our holding, however, did not turn on the distinction between mergers and consolidations. We held that ACL was a North Carolina corporation because ACLVA "the immediate predecessor of [ACL], was already a corporation of both states when the consolidation . . . took place and the [North Carolina] enabling acts [regarding Wilmington & Weldon] expressly provided that it should continue to be a domestic corporation after the railroad properties should have been united." *Id.* at 65.

In contrast, TRI, which would be the "immediate predecessor" in the alleged consolidation in this case, was not a North Carolina corporation prior to the alleged consolidation and there is no indication that the North Carolina legislature passed an enabling act requiring that a consolidation between TRINC and another corporation would result in a North Carolina corporation. Accordingly, *Town of Bethel* does not support Hugger and Settle's argument that TRI should be deemed a North Carolina citizen.

Even assuming, *arguendo*, that a "consolidation" results in the consolidated corporation being a citizen of each state in which its constituent corporations existed, there was no "consolidation" in this case.[4]

---

[4]As noted in the text, we assume without deciding that where a state legislature passes an enabling act authorizing a corporation organized in that state to execute articles of consolidation with a corporation organized outside of that state, the "new consolidated company has a legal existence in each of the states in which the constituent companies previously existed," *Winn v. Wabash R. Co.*, 118 F. 55, 58 (C.C.W.D. Mo. 1902) (cited in *Town of Bethel*, 81 F.2d at 68). We find no support in our case law, however, for the proposition that something less than a formal consolidation authorized by legislative acts of the various states results in a corporation that is a citizen in each state in which its constituent corporations existed.

Hugger and Settle base their argument that there was a consolidation solely on the affidavit of one of the directors of TRI, who stated that "[i]n 1992, TRI reorganized into regional offices operated by TRI." (J.A. at 30.) According to Black's Law Dictionary, a consolidation of corporations "[o]ccurs when two or more corporations are extinguished, and by the same process a new one is created." Black's Law Dictionary 309 (6th ed. 1990). Hugger and Settle concede that TRINC "has not been administratively dissolved and has not filed articles of dissolution." (Appellant's Br. at 13.) Moreover, there is no evidence that TRI was extinguished pursuant to its reorganization. Thus, the district court's finding that TRI is not a North Carolina citizen by virtue of "consolidation" with TRINC is not clearly erroneous.

Second, Hugger and Settle argue that "TRINC is merely a reincorporation of TRI in North Carolina." (Appellant's Br. at 18.) TRINC is a separate corporation that was incorporated and directed by North Carolina residents, not by TRI. Again, the district court's finding that there are no facts to support a formal reincorporation is not clearly erroneous.

Accordingly, we affirm the district court's denial of the motion to remand as the requisite diversity existed between the parties.

III.

We now consider Hugger and Settle's argument that the district court erred in granting summary judgment to TRI, TRINC, Whitehead, and Aden (hereinafter, collectively, TRI) on their intentional and negligent infliction of emotional distress claims. The district court held that there were no affidavits or other evidence to support Hugger and Settle's "bare allegations," (J.A. at 81(a)), of an essential element of both intentional and negligent infliction of emotional distress under state law, namely severe emotional distress, and thus, granted summary judgment to TRI.[5] "Summary judgment is appropriate when a

---

[5]The district court also held that TRI was entitled to summary judgment on the intentional and negligent infliction of emotional distress claims on the ground that Hugger and Settle, as "public officials," were required to prove actual malice under *Hustler Magazine v. Falwell*, 485

party, who would bear the burden on the issue at trial, does not forecast evidence sufficient to establish an essential element of the case, such that 'there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.'" *Wells v. Liddy*, 186 F.3d 505, 520 (4th Cir. 1999) (internal citation omitted) (quoting Fed. R. Civ. P. 56(c)). "Viewing the facts in the light most favorable to the non-moving party, we review a grant of summary judgment de novo." *Id.*

Under North Carolina law, to recover for intentional infliction of emotional distress, "a plaintiff must prove '(1) extreme and outrageous conduct, (2) which is intended to cause and does cause (3) severe emotional distress to another.'" *Beck v. City of Durham*, 573 S.E.2d 183, 190-91 (N.C. App. 2002) (quoting *Dickens v. Puryear*, 276 S.E.2d 325, 335 (N.C. 1981)). An action for negligent infliction of emotional distress under North Carolina law "has three elements: '(1) defendant engaged in negligent conduct; (2) it was reasonably foreseeable that such conduct would cause the plaintiff severe emotional distress and (3) defendant's conduct, in fact, caused severe emotional distress.'" *Wells v. N.C. Dep't of Corr.*, 567 S.E.2d 803, 814 (N.C. App. 2002) (quoting *Robblee v. Budd Servs., Inc.*, 525 S.E.2d 847, 849 (N.C. App. 2000)).

Hugger and Settle argue that their medical records show that they suffer from "severe emotional distress" because they both suffer from depression. "[T]he term 'severe emotional distress' [for purposes of both intentional and negligent infliction of emotional distress claims] means any emotional or mental disorder, such as, for example, neurosis, psychosis, chronic depression, phobia, or any other type of *severe and disabling* emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so." *Waddle v. Sparks*, 414 S.E.2d 22, 27 (N.C. 1992) (emphasis in original) (quot-

---

U.S. 46, 56 (1988), which applied the *New York Times Co.* actual malice requirement to claims for emotional distress. As our resolution of the state law issue is dispositive of the intentional and negligent infliction of emotional distress claims, we need not and do not reach this constitutional question in affirming the district court's grant of summary judgment.

ing *Johnson v. Ruark Obstetrics and Gynecology Assocs.*, 395 S.E.2d 85, 97 (N.C. 1990)). As the Supreme Court of North Carolina explained,

> "*It is only where [emotional distress] is extreme that the liability arises.* Complete emotional tranquility is seldom attainable in this world, and some degree of transient and trivial emotional distress is a part of the price of living among people. *The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it.* The intensity and the duration of the distress are factors to be considered in determining its severity."

*Id.* (emphasis in original) (quoting Restatement (Second) of Torts § 46 cmt. j (1965)). Viewing the facts in the light most favorable to Hugger and Settle, the evidence does not show that they suffer from any emotional distress "so severe that no reasonable man could be expected to endure it," *id.* (emphasis deleted). At most, the medical reports show that Settle had "worsening anxiety" on November 29, 1999, (J.A. at 128), and that Hugger received "routine medication management of depression," (J.A. at 148.). These conditions do not rise to the level of severe emotional distress under North Carolina law. *See Waddle*, 414 S.E.2d at 27. Moreover, with regard to Hugger, she also did not forecast sufficient evidence to establish that her depression was caused by TRI's actions. Her medical treatment was not closely connected temporally with TRI's actions, and her medical records indicate that her depression was caused by events in her childhood. Accordingly, we affirm the district court's grant of summary judgment on the intentional and negligent infliction of emotional distress claims.

IV.

Finally, we turn to Hugger and Settle's arguments that the district court erred by granting summary judgment on their defamation claim based on a finding that they were public officials required to prove actual malice to recover damages for defamation and that they failed to prove actual malice. A defamation claim is, at its root, a state law tort claim. The First Amendment, incorporated and applied to the

states through the Fourteenth Amendment, however, limits the state remedies available to a defamation plaintiff. *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964). Under *New York Times Co.*, a plaintiff who is a "public official" may not recover damages for defamation "relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 279-80.

TRI moved for summary judgment on the grounds that Hugger and Settle were public officials who had not shown actual malice and that the underlying statements were not defamatory. The district court proceeded directly to the constitutional question of whether Hugger and Settle are public officials, without addressing the state law question of whether Hugger and Settle proffered sufficient evidence to establish a claim of defamation under North Carolina law.

"[C]ourts should avoid deciding constitutional questions unless they are essential to the disposition of a case." *Bell Atl. Md., Inc. v. Prince George's County, Md.*, 212 F.3d 863, 865 (4th Cir. 2000) (applying the rule of *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 341-47 (1936) (Brandeis, J., concurring)); *cf. Hutchinson v. Proxmire*, 443 U.S. 111, 121 (1979).[6] "[B]y deciding the constitutional question

---

[6]In *Hutchinson v. Proxmire*, 443 U.S. 111, 122 (1979), the Court recognized that its practice is "to avoid reaching constitutional questions if a dispositive nonconstitutional ground is available." *Hutchinson*, 443 U.S. at 122. In *Hutchinson*, the court of appeals addressed the constitutional issue of whether the plaintiff was a public figure without addressing the state law issue of whether the statements constituted defamation under state law. *Id.* at 121-22. The Court noted that ordinarily it would remand the case for resolution of the state law issue because resolution of the state law issue might render resolution of the First Amendment issue unnecessary. *Id.* at 122. The court of appeals' observation that the statements "may be defamatory falsehoods," in explaining its conclusion that the statements were protected by the Speech and Debate Clause, however, indicated that the court of appeals would have held that the statements at issue constituted defamation under state law. *Id.* at 123. The Court interpreted this observation to indicate the court of appeals' view that "the appeal could not be decided without reaching the constitu-

. . . in advance of considering the state law question[ ] upon which the case might have been disposed of, the district court committed reversible error." *Bell Atl. Md.*, 212 F.3d at 866. Accordingly, we reverse the district court's grant of summary judgment on Hugger and Settle's defamation claim and remand for consideration of the state law issue in proceedings consistent with this opinion. We express no opinion on the proper resolution of either the state law issue or the constitutional law issue.

V.

For the foregoing reasons, we affirm the district court's denial of the motion to remand and the grant of summary judgment to TRI on the intentional and negligent infliction of emotional distress claims, and we reverse the grant of summary judgment to TRI on the defamation claim and remand for consideration of the state law issue in proceedings consistent with this opinion.

*AFFIRMED IN PART, REVERSED IN PART, AND REMANDED*

---

tional question." *Id.* (internal quotation marks omitted). Thus, the Court held that it was necessary to reach the constitutional issue as well. *Id.*

In the instant case, there is no indication that the district court would consider the statements to constitute defamation under state law. In fact, the district court refers to the statements as "the allegedly defamatory publication." (J.A. at 80.) Accordingly, we follow what the *Hutchinson* Court indicated would be the ordinary remedy when the lower court reaches a constitutional issue without addressing a potentially dispositive state law issue and remand to the district court for consideration of the state law issue.